PRESTON et al. v. BERRY.

No. 33200. July 17, 1951.

*234 P. 2d 417.*

Ames, Ames & Daugherty, Oklahoma City, for plaintiffs in error.

Cantrell, Carey & McCloud and B. H. Carey, Oklahoma City, for defendant in error.

DAVISON, J. This is an action wherein Howard K. Berry, the author of the biographical novel, "Moman Pruiett—Criminal Lawyer," as plaintiff, seeks an accounting, by Ben Preston and Gail H. Johnson, individually and as partners, as defendants and assignees of Moman Pruiett, of income received by them from the sale of published copies of said novel and further seeks the appointment of a receiver to take charge of their books of account and all unsold copies of said literary work. The parties will be referred to as they appeared in the trial court.

Howard K. Berry was a young practicing attorney in Oklahoma City, Oklahoma, when, in January, 1939, after several discussions and an exchange of letters with Moman Pruiett, he began composing and writing in novel form, the biography of the latter. Writing such a composition had been a dream or idea of the plaintiff, for several years, prior to his entry into the practice of law, subsequent to professional instruction in journalism in Missouri University, and while employed on the police force of Oklahoma City. On February 21, 1939, Berry and Moman Pruiett entered into a contract whereby, in consideration of Pruiett furnishing him with material and data for, and lending assistance in, the production of the biographical novel, plaintiff conveyed to Pruiett "Fifty Percent (50%) or One-

half (½), of any and all sums collected from the completed production or the marketing thereof." By the terms of said contract, Berry agreed to assemble the material into book form and to obtain copyright protection in the various fields.

During the following year and a half, Berry devoted practically all of his time, night and day, to the sorting, sifting and selection of the desired material from suitcases full of newspaper and magazine clippings, pictures, documents, etc., furnished by Pruiett. Office or studio space was rented by Berry in hotels and, during a part of the time, Pruiett used the same as living quarters. Berry devoted much time to making out-of-town trips to verify the information and spent some $2,000 in the enterprise. He made contacts with, and secured suggestions from, various editorial staffs of nationally circularized magazines. He employed stenographic help, paying for the same out of his own pocket, as was the case with all the expenses incurred. On July 13, 1940, after writing, rewriting, revising, editing and re-editing, the manuscript was sent by Berry to the publishing house of Doubleday-Doran & Co. It was returned with suggestions for further revision and editing. Then followed months of attempting to get the work published.

In response to a request by Pruiett, Berry sent him the manuscript and wrote him the following, in a letter dated September 30, 1941:

"I have explicit confidence in your integrity and ability where our contract is concerned, and I am glad to give you this letter granting you full and unrestricted authority to make any kind of an assignment, obligation or sale you care to. I would indeed be glad to have the copy placed in the hands of a competent rewrite man, and to see the story, which is a great one in text if not in execution, placed in print."

Over the strenuous objection of defendants, plaintiff was permitted to testify as to the contents of a receipt or memorandum executed by Pruiett at the time of the delivery of the manuscript, wherein he acknowledged the continuing operation of the original contract with Berry. It was defendant's contention that plaintiff was an incompetent witness because of the provisions of 12 O.S. 1941 §384.

Subsequent to the receipt of the manuscript and the above-quoted letter, Pruiett contracted with a Mr. Holland for the revision of the manuscript and publication of the book. Nothing constructive was accomplished under this contract. Its sole effect was to necessitate Berry's reconstruction of mutilated parts of the manuscript after much trouble in securing its return. Berry was called to the Army in March, 1944, and thereafter, on June 21, 1944, Pruiett made a contract with the Harlow Publishing Company for publication of a number of copies of the book. Later, on July 5, 1944, without knowledge of Berry, Pruiett assigned all his interest in the Harlow Publishing Company contract, above mentioned, the manuscript and the copyright thereof, which Pruiett had obtained in his own name, to the defendants herein, his daughter, Gail H. Johnson, and Ben Preston. Berry knew nothing of this assignment until sometime in February, 1945, some two months after his discharge from the Army. The role of the defendant, Preston, seems to have been the furnishing of necessary financial support to get the book into publication and on the market. The book was being marketed from Pruiett's office in Oklahoma City when, in January, 1945, Berry and Preston had an extensive conversation with reference to future operations. Each discussed the amount of money and effort he had put into the venture and the precarious situation that was caused by having everything handled through Pruiett's office. But it was decided that no change should be made at that time because of the sales value of such an arrangement. This same general situation continued, with neither Berry nor Preston realizing any profit or return

out of it, until Pruiett's death on December 17, 1945.

On December 21, 1945, Preston wrote the following letters to Berry:

"Charley Johnson has just called me Long Dist and ask that I come down soon as possible and see about what kind of arrangements can be made on the Book deal,He said you thought you aught to have some Interest in it and so do I,As I know that you put in many long hours in prepairing the manuscript for Moman,Just at this time it is impossible for me to leave here as we are arranging to drill an oil well at Stephenville, Texas.and they are mooving in their rig there to day,They are some things here that I have got to look after and it will be almost impossible for me to get down before the middle of next week,But in the mean time you go over this deal and figure out just what you think of it and the best way to handle it, For I am willing to abide by any thing that is fair and reasonable, and are perfectly willing for you to look after what little interest I have in it,

"Charley said that they where several orders for the book in and that you thought they aught to be held up until the thing was streightend out,I told him I thought it best to get the orders out quick as possible and let you hold the money for same, So Howard you just figure out what you think is right and I will be glad to work with you.I have never ask or received one penny from Moman,I knew he was and had been in an awful teight for a long time and I was getting by So I wanted to see him enjoy his last days on what he could get out of the bookand I am glad now that I done as I have.  With best regards to you and wishing you a Merry Xmas and a Happy and Prosperous New Years I remain as ever" and:

"Dear Howard,Since writing you this morning, I have been thinking this matter over very carefully and I think the thing should be split in three ways, and you and Gail and I share equaly.As the matter stands Gail and I have 45 per Cent and Moman 10 per cent of the whole thing.  I am willing to cut my share back to 33 1/3 and you come in for Moman's 10 per cent and Gail cut her part as I cut mine,If it had not of been for you the book would never of been written and I for one want to see you set in and get what is due you.

"I have never received one penny of the money I have let Moman have and they have sold at least $6.500 worth of books or more and Gail and them have been living off of the proceeds and you and I been getting nothing out of it.So I will try and be down there tuesday or wednesday and will see you. In the mean time you study the thing out and anything that is fair and reasonable is perfectly agreeable with me, Now this is just what I think of it and arewilling to do just as above stated, It might be best to kind of keep everthing on the quite until we know just what the score is With best regards and hoping to see you soon,I remain as ever."

This action was filed on January 9, 1946, and on December 26, 1946, judgment was rendered for plaintiff based upon findings of fact and conclusions of law by the trial court.  From that judgment, this appeal has been perfected by defendants.

The first proposition urged by defendants as grounds for reversal of the judgment is that Berry was an incompetent witness to testify about the contents of the memorandum signed by Pruiett at the time he received the manuscript from Berry in September, 1941, because of the provisions of the "dead man's statute," 12 O.S. 1941 §384, as follows:

"No party to a civil action shall be allowed to testify in his own behalf, in respect to any transaction or communication had personally by such party with a deceased person, when the adverse party is the executor, administrator, heir at law, next of kin, surviving partner or assignee of such deceased person, where such party had acquired title to the cause of action immediately from such deceased person; . . ."

But, such argument is founded upon the erroneous assumption, as an established fact, that Berry had "acquired title to the cause of action immediately from such deceased person."  Such is

not the case. Berry was the author of the book and his right to, and property in it, arose from its composition and not from any contract relating to it. His right "in his intellectual production is similar to any other personal property right. It is assignable and it may be sold and transferred in its entirety, or a limited interest therein, less than the whole property, may be sold and assigned, and the various rights included in the entire ownership may be split up and assigned to different persons. Sales may be absolute or conditional and they may be with or without qualifications, limitations or restrictions. Atlantic Monthly Co. v. Post Pub. Co., D. C. Mass., 27 F. 2d 556; American Tobacco Co. v. Werckmeister, supra (207 U.S. 284, 28 S. Ct. 72, 52 L. Ed. 208, 12 Ann. Cas. 595)." Remick Music Corp. v. Interstate Hotel Co. of Nebraska, 58 Fed. Supp. 523. Pruiett had no property therein except as conveyed to him by Berry. "There is no property right in one's life story, and cause of action for publication of incidents therein rests on tort alone." Melvin v. Reid, 112 Cal. A. 285, 297 P. 91.

Thus, Berry's property right in the novel and his cause of action founded thereon arose by reason of his authorship of it and was not "acquired . . . from such deceased person." In the case of Mike v. Gidney, 195 Okla. 472, 159 P. 2d 240, it was said:

"From a careful reading of the above statute it will be noted that it must further appear that, even though the adverse party may be in one or more of the relations to the deceased person mentioned in the statute, the party called upon to testify must also have acquired title to the cause of action immediately from the deceased person, before the statute disqualifies the witness. If the party did not acquire title to the cause of action directly from the deceased person, he is not disqualified as a witness under the statute."

The trial court was correct in overruling the objection to the competency of Berry as a witness.

The other two propositions, argued by defendants in their brief, are that because of laches Berry is estopped to claim a property right in the book or an interest in the profits resulting from its sale, as against the defendants, and further, that Berry had abandoned any interest he might have had. This position is not tenable. In arguing these propositions, and also the one above discussed, defendants take the position that plaintiff's right to recover is dependent upon the validity and enforceability of the contract of February 21, 1939, between Berry and Pruiett when, as a matter of fact, the converse is true. As hereinabove noted, Berry, because of being the author, was the sole owner of the novel or composition unless he had disposed of a part or all of the same by contract. By the contract of February 21, 1939, he had conveyed to Pruiett a 50% interest in prospective income derived therefrom. If that contract were void or ineffective, Berry was yet the owner of the entire property right. No contract or memorandum was necessary to establish that ownership. The record does not disclose any laches on his part in asserting such ownership to the detriment of either of the defendants. In so far as Pruiett's daughter, Gail H. Johnson, is concerned, the record reveals her purely as a donee, never having acted upon any representation made by Berry, either actively or in pais, to her detriment.

As to the defendant Preston, all the evidence indicates not only that he knew Berry had an interest in the book but that he recognized it and was willing to assist in its enforcement. A thorough search of the record fails to disclose any instance where the plaintiff was guilty of laches. From the time he started work on the book in January, 1939, to the time of filing suit, the plaintiff was exerting every effort to write the manuscript, to get the book published and to promote its sale.

The generally adopted rule of laches was stated in the case of American-First Nat. Bank of Oklahoma City v.

Peterson, 169 Okla. 588, 38 P. 2d 957, as follows:

"The question of whether a claim is barred by laches must be determined by the facts and circumstances in each case and according to right and justice. Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another."

The essential elements of equitable estoppel are enumerated in the case of Antrim Lumber Co. v. Wagner, 175 Okla. 564, 54 P. 2d 173, as follows:

"The essential elements of an 'equitable estoppel' are:

"First. There must be a false representation or concealment of facts.

"Second. It must have been made with knowledge, actual or constructive, of the real facts.

"Third. The party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts.

"Fourth. It must have been made with the intention that it should be acted upon.

"Fifth. The party to whom it was made must have relied on or acted upon it to his prejudice."

The facts in the instant case do not bring it within the sphere of application of these rules.

The argument of defendants, in their brief, seems to assume that if there was an abandonment of the contract of February 21, 1939, the ownership of the literary property became vested in Pruiett. Our view of the case as hereinabove expressed leaves no room for such assumption. An abandonment of the contract would wipe out the only source of title through which Pruiett could claim. Although dealing with the question of publication or abandonment to the public, the Superior Court of Pennsylvania, in the case of Berry v. Hoffman, 125 Pa. Super. 261, 189 Atl. 516, used language applicable to the situation here. Therein, it was said:

"An author cannot be justly deemed to have intended to part with his ownership by depositing the manuscript in the possession of a third person or by procuring a third person to print the work with the intention of giving it to the public at some future time. Such acts are deemed strictly limited in point of right, use, and effect to the very occasions expressed or implied. They are not construed as a general gift or authority to use the work for any purpose of profit or publication to which the third person may choose to devote them."

To the same general effect is the holding in the case of Uproar Co. v. National Broadcasting Co., 81 F. 2d 373. Thus, any abandonment of the contract would be of no avail to defendants, and the finding by the trial court that plaintiff had in no manner, nor to any extent, "abandoned, given up, sold or assigned or transferred" his literary property right in said book is supported by the clear weight of the evidence.

For these reasons, the judgment of the trial court should be and the same is affirmed.

LUTTRELL, V. C. J., and GIBSON, HALLEY, JOHNSON, and O'NEAL, JJ., concur.