## ATLANTIC MONTHLY CO. v. POST PUB. CO.

District Court, D. Massachusetts. July 3, 1928.

No. 2812.

**1. Literary property ⬚3, 4, 5—At common law, author owned manuscript and could control copying thereof only until released or dedicated to public, as by printing it for general circulation.**

At common law, an author owned his manuscript and could protect himself against theft thereof, and also had right to control making of copies until he released or dedicated it to public, as by printing it for general circulation, after which he had no control over publication thereof.

**2. Copyrights ⬚31—Absolute unrestricted sale of printed copy of article amounts to "publication" (Copyright Act [17 USCA]).**

An absolute and unrestricted sale of a printed copy of an article amounts to publication under Copyright Act (17 USCA), especially where accompanied by filing of similar copies with Register of Copyrights.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Publication.]

**3. Literary property ⬚6—Author's delivery of magazine article with intent to pass title is sufficient, without written bill of sale.**

An author, selling a manuscript to a magazine, need not do so by a written bill of sale; delivery thereof, with intention of passing title, being sufficient.

**4. Literary property ⬚6—Delivery of manuscript to magazine publisher, with intent to vest title, vested full and complete property therein, subject to conditions stated.**

Delivery of author's manuscript to magazine publisher, with intention that title to article should vest in publisher, subject to certain conditions, vested in publisher, not a mere license to print, but full and complete property in article, subject to such conditions, whether transaction was a sale or gift.

**5. Copyrights ⬚31, 57—Atlantic Monthly's copyright on Governor Smith's article in reply to article published in such magazine held valid and infringed.**

Atlantic Monthly's copyright on article, consisting of open letter from Governor Smith, of New York, in reply to article published in such magazine, *held* valid and infringed by premature publication thereof in the Boston Post.

**6. Copyrights ⬚33—Magazine publisher's exclusive property in copyrighted article terminated on its publication in such magazine and newspapers without notice of copyright, in accordance with conditions under which obtained.**

Magazine publishers's exclusive property in copyrighted article terminated on its publication in such magazine and republication in newspapers without notice of copyright, with such publisher's knowledge and consent, in accord-ance with conditions under which it was obtained.

**7. Copyrights ⬚74—Suit to enjoin, and recover damages for, infringement of copyright on article, already published by owner's consent without notice of copyright, must be dismissed (Copyright Act, § 25 [17 USCA § 25]).**

Publishing company, having no copyright on magazine article, published in its magazine and newspapers without notice of copyright, in accordance with conditions under which obtained, before filing of bill to restrain infringement and recover damages and profits or award in lieu of damages under Copyright Act, § 25 (17 USCA § 25), had no right to injunction, which was only equitable relief sought, and hence entire suit must be dismissed.

**8. Copyrights ⬚87—Damages for Infringement of copyright can be awarded only as incident to injunction.**

Award of damages for infringement of patent or copyright is made only as incident to equitable relief of injunction, and bill in equity for naked accounting of profits and damages cannot be sustained.

**9. Evidence ⬚71—There is strong presumption that stamped letters addressed to well-known person were delivered to addressee.**

There is a strong presumption of fact that letters, bearing two-cent stamps and addressed to well-known person, were delivered to addressee.

**10. Copyrights ⬚83—Evidence held to show that alleged infringer received written notice of ownership of copyright before publishing article.**

In suit to restrain infringement of copyright on magazine article and recover damages, evidence *held* to show that defendant received written notice of plaintiff's ownership of copyright through the mails before publishing article.

**11. Copyrights ⬚87—Damages and profits from infringement of copyright on magazine article prematurely published in defendant's newspaper should be awarded, instead of making award in lieu of damages (Copyright Act, § 25 [17 USCA § 25]).**

Defendant newspaper publisher having introduced much evidence as to damages and profits from infringement of copyright on magazine article, award should be made on such basis, though plaintiff elected award in lieu of damages under Copyright Act, § 25 (17 USCA § 25); such damages and profits being as ascertainable as in many cases of infringement.

**12. Copyrights ⬚87—Magazine publisher, whose copyright on article was infringed by premature publication in newspaper, may recover extra cost of reasonably necessary change of publication plans, and damages by impaired confidence in ability to protect releases to press.**

Magazine publisher, whose copyright on article was infringed by premature publication thereof in newspaper, is entitled to recover extra cost of reasonably necessary change of plans with respect to magazine issue in which article was published and damages by impaired

confidence in its ability to protect its releases to the press.

**13. Copyrights ☞87—Amount newspaper publisher prematurely publishing copyrighted magazine article, would have paid for exclusive first publication, held recoverable as profits from infringement.**

Magazine publisher, whose copyright on article was infringed by premature publication in newspaper, would be entitled to recover as profit made by infringement amount which publisher of such newspaper would have paid for exclusive first publication of article in such newspaper's field.

**14. Copyrights ☞69—Damages by infringement of copyright, lost before suing for injunction, may be recovered at law after amending bill.**

That damages by infringement of copyright on magazine article prematurely published in newspaper cannot be recovered in suit for injunction after loss of copyright by publication in magazine and other newspapers does not prevent recovery thereof at law after amending bill for injunction to state cause of action at law.

In Equity. Suit by the Atlantic Monthly Company against the Post Publishing Company. Bill dismissed without prejudice.

Thompson, Spring & Mears and Romney Spring, all of Boston Mass., for plaintiff.

Edmund A. Whitman, of Boston, Mass., for defendant.

MORTON, District Judge. This is a suit to restrain infringement of copyright, and to recover damages and profits, or, in the alternative, an award in lieu of damages, under section 25 of the Copyright Law (17 USCA § 25). It was fully heard in open court, both on liability and damages. The facts are as follows:

The article in question was an open letter from Alfred E. Smith, Governor of New York, to Charles C. Marshall, in reply to an article by Mr. Marshall which was published in the April, 1927, number of the Atlantic Monthly. Mr. Sedgwick, the editor of this magazine, being interested in the candidacy of Governor Smith for the Presidency, conceived the idea that it might be advisable for Governor Smith to meet publicly the objections to his candidacy, based upon his adherence to the Roman Catholic Church. The discussion was inaugurated by the publication of the Marshall article, which opened the door to a reply by Governor Smith. The article in question was prepared by Governor Smith and his advisors for that purpose. He took no part in the arrangements for its publication. The entire matter of publicity for it was turned over by him to Mrs. Moscowitz. She communicated with Mr. Sedgwick, with Mr. Jenkins, the treasurer of the Atlantic Monthly, and with other persons connected with that magazine, all of whom were desirous that the reply should appear in it.

From the beginning of the negotiations it was recognized that Governor Smith's reply necessarily stood on a very different footing from the usual contribution; that it was not merely a magazine article, but also political "news" of the most important character, for which the widest possible publicity was desirable. Under the circumstances, Mrs. Moscowitz agreed that the Atlantic Monthly should have the initial publication; but she carefully stipulated that concurrent therewith the reply should be given to the entire press of the country, with full rights to republish it, with or without giving credit to the magazine—a stipulation which was fully accepted and agreed to by those representing the plaintiff. Mrs. Moscowitz's testimony as to the understanding under which the manuscript was delivered to the Atlantic Monthly is not contradicted, and I see nothing unreasonable or improbable about it. I accept it as stating in substance what the arrangement was.

The plaintiff, promptly on the receipt of the manuscript, made public announcement that Governor Smith was to publish in the Atlantic Monthly a reply to the Marshall letter. There was great eagerness among the newspapers to get copies of the reply for publication. The parties concerned were aware of this, and anticipated that efforts would be made to obtain the article surreptitiously; and they adopted such precautions as occurred to them to prevent it. As soon as the article could be put into type, after the receipt of it by the plaintiff, three copies were made from galley proofs bearing notices of copyright. One of these was then sold outright for 10 cents to Mr. Jenkins, treasurer of the Atlantic Monthly Company, and the other two were filed with the Register of Copyrights. This took place on April 8, 1927, and is the copyright relied on in the bill as originally filed. Following this, the article was put into printing for the magazine. A number of galley proofs were sent to Mrs. Moscowitz, representing Governor Smith, for correction and revision. It was planned that the Atlantic Monthly carrying the reply should appear on April 25, 1927, and that the article should simultaneously appear in such newspapers as desired to publish it, which were to be provided in advance with copies to be released upon that date. These facts were widely understood. The defendant's newspaper, the Boston Post,

carried an item under date of April 11th which stated them in substance. That the editors of the Post understood the arrangement, as above stated, I entertain no doubt.

About April 11th Mr. Thompson, a reporter on the Post, applied to Mr. Jenkins for a copy of the article, and was told that all the papers would have it for the 25th, and that no paper could have it for previous publication. Following this interview, Thompson was sent by Mr. Dunn, city editor of the Post, to Concord, N. H., where the Atlantic Monthly is printed. He there induced one Callahan, employed as a watchman at the printing house, to obtain and deliver to him a copy of the article. Thompson knew that Callahan had no authority to do this. His action was in utterly bad faith. The copy so obtained was turned over to those in charge of the Post. They knew it had been obtained irregularly, probably fraudulently. It was printed in the Post, with some omissions of no legal significance, on Saturday, April 16th, constituting the leading news item in the paper for that date. About 400,000 copies were circulated. This is the infringement relied on as the basis of the present suit.

On the same day the first copies of the completed Atlantic Monthly containing the article were deposited in the mails for delivery at distant points, and copies of the magazine were duly sent to the Register of Copyrights in Washington. The copyright so obtained is set up by amendment to the bill.

The first question is whether the copyright of April 8th is valid. It is attacked on two principal grounds: First, that the Atlantic Monthly was not the "proprietor" of the article, and therefore had no standing to copyright it; and, second, that the sale to Mr. Jenkins in connection with the deposit of copies with the registry did not amount to the publication which the act requires.

[1] At common law an author owned his manuscript, and could protect thefts of it as of other property. He also had the right to control the making of copies until he had released or "dedicated" the work to the public. Printing for general circulation constituted such dedication, and thereafter the author had no control over publication of his work. It was to relieve that situation that copyright acts were passed, granting to the author or proprietor a monopoly of the right of publication. Under the present act this monopoly is obtained by publishing the article with a copyright notice thereon, and filing with the Register of Copyrights two copies of the best edition.

[2] I see no sufficient reason to disbelieve the testimony of Mr. Jenkins concerning the sale of the copy of the Smith article to him. I find that that sale was, as he says, absolute and unconditional, and that he was free to deal with the copy in any way that he saw fit. Both parties to the transaction assumed that Mr. Jenkins would make no use of it adverse to the interest of the Atlantic Monthly; but this assumption did not form part of the contract. In making the sale the plaintiff's representatives relied on Mr. Jenkins' personal and financial interest to prevent him from using his copy in such a way as to harm the magazine. The copies filed with the Register are by statute open to the public. Copyright Act, § 58 (17 USCA § 58).

It seems to me quite inadvisable to introduce into the law of copyright refinements between so-called "colorable" sales—whatever that may mean—and bona fide ones. It will be better, I think, to take the law simply and directly, and to hold that an absolute and unrestricted sale of a printed copy, especially where accompanied by filing similar copies with the Register, amounts to publication under the act; and I think the decisions support this view. Werckmeister v. Am. Litho. Co. (C. C. A.) 134 F. 321, 68 L. R. A. 591; Gottsberger v. Aldine Book Co. (C. C.) 33 F. 381; Stern v. Remick (C. C.) 175 F. 282; Callaghan v. Myers, 128 U. S. 617, 9 S. Ct. 177, 32 L. Ed. 547. The facts of the present case are very like those in Stern v. Remick, supra. In Mittenthal v. Berlin (D. C.) 291 F. 714, Judge Hand expressed doubt as to some of his expressions in the Stern Case, but no doubt at all about the result. I do not see anything in Am. Tobacco Co. v. Werckmeister, 207 U. S. 284, 28 S. Ct. 72, 52 L. Ed. 208, 12 Ann. Cas. 595, contrary to the decisions referred to.

The other points urged against the validity of the copyright do not require discussion. In my opinion, the copyright was valid in so far as the statutory formalities are concerned.

[3] As to the plaintiff's proprietorship of the article: It was the intention of Mrs. Moscowitz, representing Governor Smith, and of the persons with whom she dealt, representing the Atlantic Monthly, that the title to the article should upon delivery vest in the plaintiff, subject to the conditions stated in her testimony, and I see nothing in the facts which precludes giving effect to the arrangement as the parties understood it. It is not necessary that an author, selling a manuscript to a magazine, should do so by a writ-

ten bill of sale. Delivery of it with the intention of passing title is quite sufficient.

[4] In this case, whether the transaction be regarded as a sale or as a gift, the delivery of the manuscript vested in the plaintiff, not a mere license to print, as the defendant contends, but full and complete property in the article, subject to the reservations or conditions referred to, and left the plaintiff free to deal with the article in any way which did not in fact violate its understanding with Mrs. Moscowitz. The copyright of April 8th was not intended to be, and was not, contrary to the agreement under which the article was obtained.

[5] On all the evidence, I find and rule that on April 16, 1927, the plaintiff had a valid outstanding copyright on the article in question, which was infringed by the defendant's publication on that date.

[6] The next question is whether this copyright was subsequently lost before the filing of the present suit. The article was republished practically in full in many newspapers on April 18th without notice of copyright. This was done with the full knowledge and consent of the plaintiff. The absence of such notice was not due to accident or mistake, within the meaning of the act. It was in accordance with the conditions under which the plaintiff had obtained the article, viz. that, once published, it might be reprinted in any newspaper with or without giving credit to the Atlantic Monthly; i. e., with or without notice of copyright. In my opinion the effect of the arrangement was that the plaintiff's exclusive property in the article terminated on its publication in the Atlantic Monthly and republication in the newspapers. I think that the terms on which the magazine procured the reply were inconsistent with further exclusive rights on the part of the plaintiff, and that the wide and general publication of it without recognition of any copyright, which was assented to by the plaintiff, amounted to an abandonment of the copyright, even if it did not, as the defendant contends, invalidate it as a matter of law—a point expressly left undecided under the present act in Gerlach-Barklow Co. v. Morris, 23 F.(2d) 159, 163 (C. C. A. 2).

[7, 8] At the time when the bill was filed, the plaintiff had, therefore, no existing copyright. This being so, it had no right to an injunction. The only equitable relief sought by the bill is the injunction. As the right to it did not exist when the bill was filed, the suit must be dismissed. It is like a suit on a patent, which had expired before the bill was brought. In all suits in equity for infringe-ment of patents or copyrights, the award of damages is only made as incidental to the equitable relief of injunction. Where the claim to such relief is not established there is nothing on which to hang damages. "Our conclusion is that a bill in equity for a naked account of profits and damages against an infringer of a patent cannot be sustained." Matthews, J., Root v. Railway Co., 105 U. S. 189, at 215 (26 L. Ed. 975). See, too, Am. Falls Milling Co. v. Standard B. & D. Co., 248 F. 487 (C. C. A. 8th); Lewis Pub. Co. v. Wyman (C. C.) 168 F. 756, at 761, 762; VanRaalt v. Schneck (C. C.) 159 F. 248.

This is sufficient to dispose of the case; but, in view of the possibility of an appeal, it is perhaps advisable, as I have fully heard the evidence on damages, that I make findings on that point, although under the view which I take they are immaterial.

[9, 10] There is a preliminary question of fact on this aspect of the case, viz. whether the written notice, dated April 9th, stating that the plaintiff owned the copyright in Governor Smith's article, reached the defendant. The plaintiff's testimony is that this notice was mailed to everybody on a certain list, which included the defendant. There were several checks on the mailing, which rendered improbable inadvertent oversight. The notice was received by the Boston Herald, the Boston Globe, and New York World. The editors of the Christian Register and the Christian Science Monitor testified that they did not receive it. All persons connected with the defendant, to whose attention the notice would have come in the ordinary course of business, testified that they never saw it. The notices were mailed in sealed envelopes having the Atlantic Monthly return mark on them and bearing two-cent stamps. There is a strong presumption of fact, which has been judicially recognized, that such letters, when addressed to a well-known person, are almost always delivered to the addressee. Rosenthal v. Walker, 111 U. S. 185, 193, 4 S. Ct. 382, 28 L. Ed. 395; Knickerbocker Life Ins. Co. v. Pendleton, 115 U. S. 339, at 345, 346, 6 S. Ct. 74, 29 L. Ed. 432; Hand & Johnson v. Canada S. S. Line (C. C. A.) 281 F. 779, at 782, 783.

The testimony of some of the important witnesses for the defendant on this question is entitled to but little weight. They were participants in the fraudulent procurement of the article, and it is not to be supposed that their memories about it are either diligent or trustworthy. I have no doubt that Dr. Dieffenbeck, Mr. Harrison, and Mr. De-

land believe that the notice never reached them. Giving due weight to their testimony, it still seems to me distinctly more probable that the notice did reach the defendant, to whom it was sent, than that it failed to do so; and I accordingly find that the defendant received it.

[11] The next question is whether damages and profits should be awarded, or there should be an award in lieu of damages under the statute. Under the finding which I have made, the plaintiff, if entitled to do so, elects the latter alternative. Much evidence was introduced by the defendant on damages and profits. They are as ascertainable as in many cases of infringement. This being so, the award should, in my opinion, be made on that basis.

[12] The plaintiff, as owner of the copyright, was justified in going ahead on the assumption that its rights would be respected and in arranging its business on that basis. The infringement rendered reasonably necessary a change of plans with respect to the plaintiff's May issue. The extra cost of this, amounting to about $3,500, is recoverable, if the plaintiff is entitled to damages. The plaintiff claims that the infringement interfered with its business in other ways and caused money loss to it. Mr. Sedgwick and Mr. Jenkins testified that this loss amounted to $50,000. It seems to me an altogether excessive estimate. The shrinkage in renewals for May was quite as likely to have been due to other activities of the magazine as to the infringement in question. The premature publication undoubtedly impaired confidence in the plaintiff's ability to protect its releases to the press, and in other ways caused it substantial damages. The amount of them is not easy to state, but I am satisfied that they were as much as $10,000; and I accordingly should allow that sum, in addition to the $3,500 above mentioned, if I thought damages recoverable in this proceeding.

[13, 14] As to profits: The plaintiff would be entitled to recover the profit which the defendant made by the infringement. The profits on the sale of that issue of the newspaper are not established. Evidence has been offered as to the money value of Governor Smith's reply for exclusive first publication in the New England newspaper field. I have no doubt that the Post would have gladly paid $10,000 for it under those conditions, and I find that this amount was the profit which the defendant made by the infringing publication—making the total damages and profits $23,500. The fact that damages cannot, for the reasons stated, be recov-

ered in equity, does not, of course, mean that they are not recoverable at law. The plaintiff may, if so advised, move within 30 days to amend the present bill into an action at law. . Otherwise the entry will be:

Bill dismissed, without prejudice, but with costs.