**PUBLIC AFFAIRS ASSOCIATES, INC.,**
Plaintiff,

v.

**Vice Admiral Hyman G. RICKOVER,**
Defendant.

**Civ. A. No. 116.**

United States District Court
District of Columbia.

Oct. 23, 1959.

Stanley B. Frosh, Washington, D. C.,
for plaintiff.

Joseph A. McDonald, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is the trial of an action for a declaratory judgment. The case has been submitted on an agreed statement of facts supplemented by a number of documents that were introduced in evidence. The suit is brought by a publishing house against a Vice Admiral of the United States Navy, to secure an adjudication that would declare in effect that the defendant has no property right in his speeches; that they are not subject to copyright; that any one is free to publish them at will without paying him any royalty or other compensation; and that he may not cause any person to be restrained from reproducing them, in whole or in part. The basic question presented is whether Government officials have a literary property in their public utterances and publications, and may secure for themselves the benefits of the copyright law and, if so, under what circumstances and to what extent.

The pertinent facts are as follows. The defendant, a Vice Admiral of the United States Navy, occasionally delivered speeches on matters of public interest. Some of them dealt with ideas that the Admiral developed in connection with his activities as a Naval officer. The plaintiff is a publishing house located in Washington, D. C. On October 29, 1958, the plaintiff wrote to the defendant requesting copies of two of his recent speeches indicating that the writer of the letter intended to quote from them in a forthcoming book. The defendant's secretary replied, enclosing copies of the two speeches, but stated that permission to quote from them could not be granted because they were to be included in a book to be published in the near future. The plaintiff responded by letter stating that the speeches were made by the Admiral in his official capacity and that it was not proper to restrict their use in any way. In addition in a telephone conversation with the Admiral, the plaintiff indicated a desire to publish the Admiral's speeches. The defendant's publishers then gave formal written notice to the plaintiff that action would be brought if the plaintiff were to infringe defendant's legal rights.

These exchanges finally led to the institution of the present suit for a declaratory judgment. It is the contention of the plaintiff that since the speeches were made on topics that were the outgrowth of the defendant's Government activities and in part prepared on what the plaintiff calls "Government time" and with the aid of Government facilities, he has no literary property in his speeches and may not secure a copyright on them, but that they are in the public domain and are available without restriction to any one who desires to reproduce them. It is urged by the defendant, on the other hand, that since the writing and delivery of the speeches in question were no part of his official duties, he has a literary property in them to the same extent that any one else has in his own utterances, that he may secure copyright protection as to them, and may bar others from disseminating them.

The evidence shows that between October 20, 1955 and January 16, 1959, when this suit was instituted, the Admiral delivered twenty-three speeches on various topics before numerous organizations and groups. Some of the addresses dealt with such subjects as:

"Nuclear Power"
"Metallurgy in Atomic Power"
"The Challenge of Nuclear Power"
"The Naval Revolution"

and similar topics. Others were devoted to the field of education. Some of the titles in this group are:

"The Education of Our Talented Children"
"The Talented Mind—An Opportunity and an Obligation"
"The Balance Sheet on Education"
"Education in the Nuclear Age"
"European and American Secondary Schools—A Comparison".

Mimeographed copies of each of the speeches were generally distributed at or about the time of their delivery to interested persons. Some of them were later published in book form, the book, of course, being registered for copyright. Subsequently to December 1, 1958, the Admiral adopted the practice of placing a copyright notice on mimeographed copies of his speeches, obtaining a copyright on each of his addresses at the time of delivery.

Although Government officers and employees have been the authors of speeches, articles, addresses, pamphlets, books, and other writings on numerous subjects at different times from the early years of the Republic, the question here presented does not appear to have been raised in any reported case decided by any appellate court. In numerous instances the author secured a copyright on his literary product and presumably received either royalties or other compensation in connection with its circulation, but it does not appear insofar as reported cases are concerned that any publishing house has ever before contended that it is free to re-publish such material without any compensation to the author and without his permission or consent.

Some assistance can indeed be found in litigation involving patented inventions made by Government officers or employees.[1] The two types of property are analogous. Each is intangible. In each instance the property is an idea in its ultimate analysis. To be sure, technically a patent covers not the idea of the inventor or discoverer, but its concrete embodiment. Nevertheless, the embodiment is the product of an idea. So, too, a copyright covers the literary form of an idea. True, there is a distinction in the manner in which the Government deals with patents and copyrights in respect to itself. It frequently obtains patents on developments originating in Government research laboratories. On the other hand, as a matter of policy, it does not secure any copyrights on publications issued by it. The distinction is due to an Act of Congress which expressly precludes the Government from procuring copyrights, but places in the public domain the literary products originally owned by it.[2]

Publications emanating from Government officers and employees may be divided into three categories. The first group consists of publications prepared by a Government officer or employee as part of his official duties and issued by the Government as a public document. In other words in such cases the officer or employee is hired to write for the Government. Countless examples of publications in this class can be found: maps prepared by employees of the Coast and Geodetic Survey and the Geological Survey; manuals issued by various Government departments, such as the Manual of Courts-Martial; bulletins of the Department of Agriculture; histories of military or naval operations in which the United States participated, prepared by a Division of Military or Naval History of the Department of Defense and printed and circulated by the Government; and numerous other Government publications. Since the author of each of them was hired to prepare the publication and did so as part of his official duties, he has no literary property in the product. It belongs to the Government and because of the above mentioned Act of Congress falls into the public domain.

The second category involves literary products of Government officers or employees that have no connection whatever with the official activities of the author. For example, a Government officer or employee may write a novel,[3]

1. United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L. Ed. 1114.

2. 17 U.S.C. § 8.

3. Washington Irving and Nathaniel Hawthorne produced some of their best writings while in the Government service. General Lew Wallace is said to have written "Ben Hur" in the Governor's Palace at Santa Fe, while Governor of the Territory of New Mexico.

or a book of poems,[4] or perhaps a book in the field of history, while the author's official duties may be entirely unrelated to the subject. Obviously, in such cases the author has the same literary property in his output that would be true of any other member of the public, and the fact that he happened to be employed by the Government would no more affect his rights than if he were an employee of a private business concern.

The third class lies between the other two. It comprises literary products of a Government officer or employee that have some bearing on, or that arise out of his official actions, although writing the book or delivering the address in question, is no part of his official duties. The defendant's literary products involved in this case are in this group.

■ Every Government officer or employee naturally owes the utmost loyalty to his employer. He is under a legal and moral obligation to use his best endeavors in the performance of his functions and to utilize all of his abilities, knowledge and experience to that end. On the other hand, no one sells or mortgages all the products of his brain to his employer by the mere fact of employment. The officer or employee still remains a free agent. His intellectual products are his own, and do not automatically become the property of the Government. The circumstance that the ideas for the literary product may have been gained in whole or in part as a result or in the course of the performance of his official duties, does not affect the situation.

■ It is not in the public interest to hamper the intellectual growth of any one, or to interfere with the development of ideas, merely because the person who is uttering them happens to be employed by the Government. So, too, title to literary property cannot be made to depend on such minor considerations, as whether any part of the work was done during office hours, whether a Government secretary participated in getting the manuscript ready, or whether a Government mimeograph or multigraph machine was used in preparing copies. If any Government agency objects to such a course, the matter can be dealt with by regulations or other intramural action, but no such circumstances can deprive the officer or employee of title to property which otherwise belongs to him. In this instance, although the Court caused the United States Attorney to be notified of the pendency of this proceeding, and extended an opportunity to Government counsel to appear as *amicus curiae*, the Government did not avail itself of this invitation. Manifestly, it is a fair inference that the Government does not feel that it has any interest in the proceedings and that it does not desire to assert any paramount title, or to claim that the literary product here involved is in the public domain.

In Sherrill v. Grieves, LVII the Washington Law Reporter 286, decided by the Supreme Court of the District of Columbia,[5] it was held that an instructor at an Army school who reduced his lectures to writing and arranged for their publication, had a right to secure a copyright on the book, and that the work was not a Government publication or in the public domain.

■■ In the light of the foregoing discussion, the Court reaches the conclusion that literary products in the third category above-mentioned, are not in the public domain, but remain the property of the author to the extent to which the common law and the law of copyright otherwise protect him, and that his rights are not affected by the fact that he may be a Government officer or employee. In fact it is in the public interest for the Government to encourage intellectual development of its officers and employees, and to look with favor upon

4. Walt Whitman was a Government employee for a number of years.

5. The Supreme Court of the District of Columbia, was a trial court of general jurisdiction and was the predecessor of the United States District Court for the District of Columbia.

their making literary and scientific contributions. It is a matter of common knowledge that this course is followed by private industry. Many scientific articles published in technical journals are written by scientists employed by private concerns and their employers generally encourage such activities. No one would contend that the copyright on such articles would belong to the employer.

The conclusion here reached is supported by the views of the Supreme Court in respect to patents on inventions made by Government employees. In United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 557, 77 L.Ed. 1114, one Lowell and one Dunmore were scientists employed in the Radio Division of the Bureau of Standards. They were assigned to work on certain radio projects as a part of their official duties. In the course of these activities they conceived the idea of devising a radio instrument to be operated by the ordinary house alternating electric current. Previously radio receivers depended on batteries. They proceeded to develop their idea in the laboratories of the Bureau of Standards and with the use of Government material. They finally invented such a radio receiver and embodied it in the form in which it could be manufactured on a practical basis. It became the modern radio receiver of the type used in the home. They obtained patents on their invention and sold them to Dubilier Condenser Corporation. The Government took the position that it was the owner of the invention and brought suit to compel an assignment of the patents to it. The litigation eventually reached the Supreme Court, which held that the invention belonged to Lowell and Dunmore and that, therefore, they had a right to obtain patents on it and to retain title to the patents or otherwise dispose of them. Mr. Justice Roberts, in the course of his opinion, made the following observations:

"One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560. On the other hand, if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent."

The rights of Lowell and Dunmore and their assignee were held limited only by the right of the Government to a "shopright" or a non-exclusive license.

In the Dubilier case, the facts were much stronger against the Government officers than is true of the case at bar. In the former, the invention was made by Government employees in the very field in which their duties were performed. They used the facilities of the Government laboratories and worked during office hours, in order to develop their invention. Nevertheless, the Supreme Court reached the conclusion that the invention was their own property, since making the invention was not part of their official duties.

Government officers and employees, as has been stated, have been authors of numerous important and valuable publications from time to time. To endeavor to list many of them would unduly prolong this opinion. A few striking examples, without referring to persons now living, may, however, be of interest. Gideon Wells, Secretary of the Navy during the administration of President Lincoln, kept a series of voluminous diaries which were later published in book form, and which form an important source of material for historians of the Civil War era. The publication was under a private copyright. In our own

time, Harold L. Ickes, Secretary of the Interior during the administration of President Franklin D. Roosevelt, kept a daily diary while in office which contained comments on current events and public men. Again the diaries were published in book form under a private copyright.

Perhaps one of the outstanding literary products of a Government officer is the classical treatise by Admiral T. Mahan on "The Influence of Sea Power Upon History", which is regarded as a permanent authority in its field. It is understood that Admiral Mahan at the time that he worked on the book was a Professor at the Naval Academy at Annapolis. This work, too, was issued under a private copyright.

A litigation that not only has legal significance but is also of historical and antiquarian interest with a touch of romance, is that relating to the ownership of the original rough notes kept as a basis for a formal diary by Captain William Clark of the famous Lewis and Clark Expedition. The location of these documents was unknown for nearly one hundred and fifty years. After the death of one Sophia V. H. Foster on December 20, 1952, these papers were found in the attic of her home in St. Paul, Minnesota. The documents were located in a desk formerly owned by her father, General John Henry Hammond. The executor of Mrs. Foster's estate brought suit against the Minnesota Historical Society and others to quiet the executor's title to the documents. The United States intervened claiming paramount title to the papers on the ground that they were contemporaneous notes made by Captain Clark from day to day during the expedition as part of his official duties. Judge Nordbye of the United States District Court for the District of Minnesota, in a well considered opinion, reviewing the facts in detail, held that these notes were Captain Clark's personal property; that they did not belong to the Government, and concluded that the claim of the Government to paramount title could not be sustained, First Trust Co. of St. Paul v. Minnesota Historical Soc., D.C., 146 F. Supp. 652. His decision was unanimously affirmed by the Court of Appeals for the Eighth Circuit, United States v. First Trust Co. of Saint Paul, 251 F.2d 686.

It is finally claimed that of the speeches involved in this case those delivered prior to December 1, 1958, have been dedicated to the public and are in the public domain by reason of the fact that the defendant did not place a copyright notice on any of them, and that he permitted or acquiesced in the distribution of a limited number of mimeographed copies at the meetings at which the speeches were made. It is well established, however, that a restricted distribution of a limited number of copies does not constitute an abandonment of the literary property or a dedication to the public. It does not bar the author from later procuring a copyright when the product is actually published. In Werckmeister v. American Lithograph Co., 2 Cir., 134 F. 321, 324, 325, 68 L.R.A. 591, this doctrine was formulated and applied by the Court of Appeals for the Second Circuit, in the following manner:

"Publication of a subject of copyright is effected by its communication or dedication to the public. Such a publication is what is known as a 'general publication.' There may be also a 'limited publication.' The use of the word 'publication' in these two senses is unfortunate and has led to much confusion. A limited publication of a subject of copyright is one which communicates a knowledge of its contents under conditions expressly or impliedly precluding its dedication to the public. * * *

"The nature of the property in question in large measure determines the extent of the public right. Thus, in case of a book, ordinarily the sole practical benefit to the author is in the right to multiply copies. The exhibition or private circulation of the original or of print-

ed copies is not a publication, unless it amounts to a general offer to the public."

The views of the Court of Appeals for the Second Circuit on this point were expressly approved by the Supreme Court in American Tobacco Co. v. Werckmeister, 207 U.S. 284, 299, 28 S.Ct. 72, 52 L.Ed. 208.

The following cases are to the same effect: M'Dearmott Commission Co. v. Board of Trade, 8 Cir., 146 F. 961, 963; Bartlett v. Crittenden, 2 Fed.Cas.No. 1,076, pp. 967, 970.

In view of the foregoing discussion, the Court concludes that the plaintiff is not entitled to a declaratory judgment as prayed for, but that the complaint should be dismissed on the merits, as the defendant has a literary property in the speeches and addresses referred to in the complaint.

This opinion will constitute the findings of fact and conclusions of law.

Counsel will submit a proposed judgment.