**PUBLIC AFFAIRS ASSOCIATES, INC.,**
**Trading as Public Affairs Press,**
**Appellant,**

v.

**Vice Admiral Hyman G. RICKOVER,**
**Appellee.**

**No. 15463.**

United States Court of Appeals
District of Columbia Circuit.

Argued April 6, 1960.

Decided Oct. 20, 1960.

Washington, Circuit Judge, dissented.

**264**

Mr. Stanley B. Frosh, Washington, D. C., for appellant.

Mr. Joseph A. McDonald, Washington, D. C., with whom Mr. Edwin S. Nail, Washington, D. C., was on the brief, for appellee.

* Sitting by designation pursuant to Sec. 294 (a), Title 28 U.S.C.

1. Public Affairs Associates, Inc. v. Rickover, D.C., 177 F.Supp. 601.

Before Mr. Justice REED, retired,* and WASHINGTON and DANAHER, Circuit Judges.

Mr. Justice REED, sitting by designation.

This is an appeal from the judgment of the United States District Court for the District of Columbia dismissing after trial on the merits a complaint for a declaratory judgment.1 Appellant, an educational publishing organization, complained on January 16, 1959, that appellee, an admiral of the United States Navy, refused appellant the right to "use, quote or publish" speeches appellee had made "in his capacity as an admiral." Appellant claimed the right to publish because appellee used the "facilities, information and data obtained * * * in connection with his duties as a public official." Appellant further alleged that the speeches have been released to the public press and therefore "are in the public domain and not subject to any curtailment as to use."

Judgment was sought "declaring defendant may not restrict the quotation from these public speeches, either in full or in part, in book form or otherwise, once they have been delivered publicly"; that "copyright" restrictions on his public speeches be declared removed.2

After an answer denying portions of the complaint, an agreed statement of facts was filed. That statement showed that the appellee during the pertinent period was a vice admiral on active duty in the Navy Department as Assistant Chief of the Bureau of Ships for Nuclear Propulsion and Assistant Director for Naval Reactors, Division of Reactor Development, United States Atomic Energy Commission. From October 20, 1955, to the commencement of this action, Admiral Rickover delivered twenty-three

2. Jurisdiction and the existence of actual controversy is not contested. 28 U.S.C. § 1338; White v. Kimmel, 193 F.2d 744 (9th Cir., 1952).

speeches in public.[3] Some months prior to the institution of this suit, July 9, 1958, he had contracted with E. P. Dutton & Co., Inc., to publish a book to be known as Addresses of Admiral Rickover, based in part on certain of said speeches. The contract asserted that ownership of the speeches was in Admiral Rickover. On December 1, 1958, the Admiral filed, subsequent to their delivery, an application for registration of a claim to copyright in a compilation of the first 22 of the speeches in question with a copyright notice. The appellee recognizes that the "compilation did not revive any exclusive rights held in such material prior to" previous publication. The same day appellee filed application for registration of speech No. 23. This last speech was delivered December 11, 1958. On January 12, 1959, a book published by E. P. Dutton & Co., Education and Freedom, based largely on a number of the speeches in controversy, was offered for copyright in the name of Admiral Rickover and registered.

The agreed statement of facts shows that the writing of these speeches was done at home after normal working hours or while traveling. It was agreed:

"The speeches were written by the Admiral in longhand. A large part of the speeches were typed by Mrs. Rickover at home. The typewritten material plus some handwritten portions were brought in to the Admiral's office for the typing of a final copy and the preparation of a multilith master by the Admiral's secretary. In some cases the master was prepared directly from the typewritten copy as brought in from home. All of the speeches were multilithed on Government duplicating machines.

\* \* \* \* \* \*

"The defendant admits that it was his practice to have his speeches as prepared for distribution bear his name, his rank in the United States Navy and his title in the Atomic Energy Commission, that the speeches as distributed customarily bore a statement 'for release' giving the date and frequently the time of the release and with few exceptions were

3. (1) Metallurgy in Atomic Power, October 20, 1955, National Metals Congress of the American Society for Metals; (2) Nuclear Power and the Navy, October 27, 1955, San Francisco Council of the Navy League, the Chamber of Commerce and the Commercial Club; (3) Engineering and Scientific Education, November 22, 1955, the Thomas Alva Edison Foundation, Inc.; (4) Lead Time and Military Strength, January 12, 1956, The Society of Business Magazine Editors; (5) Nuclear Power and the Navy, August 16, 1956, Bellefonte Sesquicentennial; (6) The Education of Our Talented Children, November 20, 1956, The Institute Sponsored by the Thomas Alva Edison Foundation, Inc.; (7) Nuclear Power—Challenge to Industry, January, 1957; (8) The Challenge of Nuclear Power, March 1, 1957, The District of Columbia Council of the Navy League of the United States; (9) The Talented Mind—An Opportunity and an Obligation, March 11, 1957, Westinghouse Science Talent Search Award Ceremony; (10) Energy Resources and Our Future, May 14, 1957, Annual Scientific Assembly of the Minnesota State Medical Association; (11) The Naval Revolution, September 14, 1957, American Legion Naval Affairs Committee; (12) International Communication Award "Christopher Columbus," October 12, 1957; (13) The Balance Sheet on Education, November 22, 1957, The Institute Sponsored by the Thomas Alva Edison Foundation, Inc. at the Engineering Society of Detroit; (14) Revolution at Sea, December 5, 1957, Overseas Press Club; (15) Education in the Nuclear Age, December 6, 1957, Dedication of Nuclear Power Training School; (16) European and American Secondary Schools—A Comparison, March 23, 1958, Fiftieth Anniversary, St. Alban's School; (17) The Truth Shall Make You Free, April 19, 1958, The Inauguration Ceremonies of Polytechnic Institute of Brooklyn; (18) The Meaning of Your Profession, June 14, 1958, Stevens Institute of Technology; (19) Investment in Human Resources, September 25, 1958, Engineers Club of St. Louis; (20) The Meaning of the Natilus' Polar Voyage, September 29, 1958, Altoona Lions Club; (21) A Common Heritage, October 23, 1958, Columbia University Forum; (22) Theodore Roosevelt—Modern American, October 27, 1958, Presentation, Theodore Roosevelt Distinguished Service Medal; (23) Education—Our First Line of Defense, December 11, 1958, The Harvard Club of New York City.

on the paper stock used for press releases by the Department of Defense or the Atomic Energy Commission."

After multilithing and at or before delivery, all speeches except Nos. 7 and 12 in footnote 3, supra, were distributed. The statement of agreed facts shows as follows:

"Certain of the speeches, approximately sixteen in number, were also made available to the press through the Public Information Office of the Department of Defense or of the Atomic Energy Commission, or both. In distributing the speeches, Admiral Rickover mailed some to individuals who had requested copies or who[m] Admiral Rickover believed would be interested in the subject. Some were sent by Admiral Rickover, approximately 50 in each case, to the sponsor of the speech to be made available to the press and others at the place where the speech was to be delivered. Some speeches were sent to the Press Club in Washington by Admiral Rickover for the use of representatives of the press."

Each speech was cleared by the Department of Defense, Office of Security Review. This was done under § 1252 of the General Regulations of the Navy which, inter alia, provide:

"3. Persons in the naval service desiring to publish articles on professional, political, or international subjects in accordance with the provisions of this regulation shall cause their signatures to appear on such articles, together with a statement to the effect that the opinions or assertions contained therein are the private ones of the writer and are not to be construed as official or reflecting the views of the Navy Department or the naval service at large. Immediately upon the acceptance of such articles for publication, the writer shall forward a complete copy of such articles to the Secretary of the Navy for the files of the Navy Department."

There was also a Department of Defense Directive in effect during the time the speeches were delivered.[4]

Admiral Rickover had duties of supervision and inspection that could be carried out at or near the various points of delivery, and arrangements were made to make the speeches in free or "off duty" hours. No transportation costs were paid by Admiral Rickover in connection with his addresses. Honoraria, when offered, were paid directly to charities specified by the Admiral.

The District Court in its opinion determined that the addresses listed in note 3 fell into a class of literary productions "that arise out of [the author's] official actions, although writing the book or delivering the address in question, is no part of his official duties."[5] Therefore, the trial court determined these addresses were not governmental publications. It was also held that the issue of the press releases and the delivery of the speeches were not "an abandonment of the literary property or a dedication to the public."[6]

4. "V. *Writing for Publication by Defense Personnel, as Individuals.* Personnel of the Department of Defense, military and civilian, who write for outside publication not in connection with their official duties on any subject or in any form shall ascertain that such activity will not interfere or conflict in any way with their regularly assigned duties. Such activity will not be conducted during normal working hours, or accomplished with the use of Department of Defense facilities, or personnel. Such writers will be on an exact parity with outside professional writers with respect to accessibility and use of technical or other information for manuscripts or articles written for publication. Articles by such personnel, dealing with military matters, will be submitted to the Office of Security Review, OASD (PA), for review and clearance to avoid any possible violation of military security." DOD Directive No. 52,309, Aug. 17, 1957.

5. 177 F.Supp. 601, 604.

6. Id., at page 606.

## I.

■ Underlying an analysis of the respective contentions of the parties here is the legal right of an author of books, lectures or addresses in his unpublished writings. Copyright, the exclusive right of an author to publish for a limited time his work, did not exist at common law even though at common law an author had a property right in his unpublished work.[7] This property right enabled an author to control the disposition of his work until such time as he released it to the public. If this right of control had not ended with publication, there would have been no need of copyright protection. The property right would have been perpetual. The problem of balance between the rights of authors to the fruits of their efforts and the right of the public to have opportunity for learning or diversion was solved by adoption of the copyright acts.[8] Although after publication the rights of authors in the United States are now measured by the Copyright Act, their common law right to the first publication has been preserved.[9] We have not depended primarily upon the flexibility of the common law in the development of copyright. This right to choose the time and manner of releasing to the public the labor product of the mind protects against literary piracy.[10]

■ Speeches and lectures for oral presentation may be copyrighted under the Copyright Code.[11] Their texts, of course, may be copyrighted as writings under § 4.[12] Were the Admiral a private citizen, therefore, no substantial question would exist as to the susceptibility of these works to statutory copyright. The cases make it clear that an author's common law copyright may exist in lectures and other works that are performed as well as in writings.[13] Our consideration turns first to whether the lectures' general susceptibility to copyright is affected by the Admiral's status as a high government official and the nature of the material discussed. Narrowly stated in terms of the statutory provisions, were these speeches or their written texts publications of the United States Government in which, under § 8 of the Code, no copyright shall subsist.

In the present case Public Affairs Press asserts first, that as these speeches "resulted from his official responsibilities" they should be classified as a "publication of the United States Government" under 17 U.S.C. § 8, which provides, "No copyright shall subsist in * * * any publication of the United

---

7. Mazer v. Stein, 347 U.S. 201, 214–215, 74 S.Ct. 460, 98 L.Ed. 630; Wheaton v. Peters, 8 Pet. 591, 657, 662, 8 L.Ed. 1055; White-Smith Music Pub. Co. v. Apollo Co., 209 U.S. 1, 15, 18–20, 28 S.Ct. 319, 52 L.Ed. 655 (concurring opinion). The weight of the English cases supports this view. See Millar v. Taylor, 4 Burr. 2303, 98 Eng.Rep. 201 (1769 K.B.); Donaldson v. Beckett, II Brown 129, 1 Eng.Rep. 837 (1774 H.L.); Jefferys v. Boosey, 4 H.L. Cas. 815, 961 (1854); Copinger and Skone James, Copyright (9th ed., 1958) 2, 16.

8. Seo Holmes v. Hurst, 174 U.S. 82, 85, 19 S.Ct. 606, 43 L.Ed. 904.

9. 17 U.S.C. § 2: *"Rights of author or proprietor of unpublished work.* Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor."

10. Exploitation of the work of others has been not infrequent in England and the United States. See Dickens v. Hawksley, [1935] 1 Ch. 267, 287; Macmillan & Co. v. Dent, [1907] 1 Ch. 107; Holmes v. Hurst, 174 U.S. 82, 19 S.Ct. 606, 43 L.Ed. 904; Mifflin v. R. H. White Co., 190 U.S. 260, 23 S.Ct. 769, 47 L.Ed. 1040; Mifflin v. Dutton, 190 U.S. 265, 23 S.Ct. 771, 47 L.Ed. 1043.

11. 17 U.S.C. § 12.

12. 17 U.S.C. § 4: "The works for which copyright may be secured under this title shall include all the writings of an author."

13. Ferris v. Frohman, 223 U.S. 424, 430, 32 S.Ct. 263, 56 L.Ed. 492; Nutt v. National Institute, Inc., 2 Cir., 1929, 31 F. 2d 236.

States Government." [14] This generalization creates a sea of troublesome questions. Such publications range from the Presidents' messages on the State of the Union, the Congressional Record, departmental pamphlets, maps, regulations, and judicial decisions to forms for the moving of admission to the bars of the various courts. Apparently the language of the provision originated in the Act for Public Printing, 28 Stat. 601, § 52.[15] It is designed to achieve in a democracy that depends upon accurate public knowledge the broadest publicity for matters of government. No clarification of the meaning of "publication of the United States Government" appears in the Rules and Regulations of the Copyright Office.[16] The provision grew out of a "confused entanglement" over the sale of the stereotype or electrotype plates desired by Representative James D. Richardson for use in a publication "prepared, compiled and edited by him on behalf of the Joint Committee on Printing." [17]

The language of the original statute on printing—"No * * * Government publication shall be copyrighted" —seems to refer to a publication actually produced by the Public Printer.[18] The Printing Office provision seems to mean, if read naturally, "produced in that office."[19] The Copyright provision should be read, we think, to refer to publications commissioned or printed at the cost and direction of the United States. These would be authorized expositions on matters of governmental interest by governmental authority.[20] The second section of § 8 protects authors' copyrights against governmental use of copyrighted material.[21]

Both ordinary practice [22] and the decided cases support our conclusion.[23] Before any enactment as to governmental publication, the Supreme Court declared that federal judicial opinions as such, "published under the authority of Congress," were not copyrightable.[24] The Court returned the Wheaton case to the trial court, however, for determination of whether Mr. Wheaton had complied with copyright as to his own notes on the cases.[25] That action recognizes the right,

14. This provision appeared as § 7 of the 1909 Copyright Act, 35 Stat. 1077.

15. See the discussion in Berger, Copyright in Government Publications, in Copyright in Certain Works, General Revision of the Copyright Law, Copyright Office, Study No. 21 (A–C), p. 4 (1959).

16. 37 C.F.R. § 201.1–201.8 (1960).

17. I Messages and Papers of the Presidents I, II, III (1913 ed., Bureau of National Literature) copyright 1897 by James D. Richardson. See Stiefel, Piracy in High Places, in ASCAP Copyright Symposium No. 8, p. 3, 25 (1957).

18. See S. Rep. No. 1473, 56th Cong., 1st Sess.

19. S. Rep. No. 1473, supra, p. 2:
"The Committee on Printing will not undertake to discuss the legal question here involved further than to say that the prohibition contained in the printing act was intended to cover every publication authorized by Congress in all possible forms, * * * "

20. It would not seem to us that occasional use of a governmental secretary for transcribing or of multilithing machines for copies for publicizing the speeches would fall under the statutory concept of a publication by or at the cost of the United States.

21. "The publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgment or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor."

22. See the list of fifteen senior military officers who, while on active duty, were said to have published books relating to military experiences. 105 Cong.Rec. 15927–15928 (daily ed., Aug. 31, 1959). See 7 Decisions of Comp.Gen. 221, 223.

23. See a thorough note on this case below, 60 Col.L.Rev. 398 (1960); 73 Harv.L. Rev. 1219 (1960). See a discussion of cases 24 Geo.Wash.L.Rev. 423, 443–447 (1955–56).

24. Callaghan v. Myers, 128 U.S. 617, 649, 9 S.Ct. 177, 32 L.Ed. 547; Wheaton v. Peters, 8 Pet. 591, 668, 8 L.Ed. 1055.

25. Callaghan v. Myers, supra, 128 U.S. at page 650, 9 S.Ct. at page 185. See Mr.

outside of statutory allowance or negation, of a governmental employee to copyright comments on non-copyrightable governmental publications. In Sherrill v. Grieves, Sup.Ct.D.C.1929, 57 Washington Law Rep. 286, 290, an author's copyright on a pamphlet previously published by a governmental school for officers for use in local instruction with the author's consent was upheld against the contention that it was a governmental publication. The author was a government employee but the writing of the pamphlet was outside his employment. In Sawyer v. Crowell Pub. Co., D.C.S.D.N.Y.1942, 46 F.Supp. 471, 473, the court dealt with a map produced by government employees in the course of their duties, copyrighted by one employee and then published by the Government with notice of that copyright registration. The court held that as the map "relates directly to the subject matter of the plaintiff's work" and was printed and engraved by the Government, the attempted copyright inured to the employer's benefit. Compare United States v. First Trust Co. of St. Paul, 8 Cir., 1958, 251 F.2d 686, an action to quiet title, where it was held that a book of notes of exploration kept by Col. Clark was a private journal. He was an army officer, a member of the Lewis and Clark expedition, but Lewis was the commander. Lewis was instructed to keep notes by President Jefferson. This he did. Lewis also sent Clark's notes for the perusal of the President but with comments and directions that caused the court to hold they were to be treated as private notes rather than official, as Lewis' were. As the Clark notes were not shown to be kept in accordance with Clark's duties, the court held them not to be the property of the Government.

■ It cannot be properly said, as appellant asserted, that a government official who speaks or writes of matters with which he is concerned as an official is by the very fact of being such an official barred from copyright on his productions. If they are statements called for by his official duties or explanations as guides for official action they are barred from a copyright. A perusal, even of the titles and the places of delivery alone, should be sufficient to show that these addresses were not governmental publications in that sense. The speeches themselves bear out this statement. We hold that none of these papers is a governmental publication.

## II.

■ The next question is whether Admiral Rickover has forfeited his right to a copyright on the twenty-two addresses delivered before December 1, 1958.[26] The Copyright Act, § 8, so far as here important, provides, "No copyright shall subsist in the original text of any work which is in the public domain." The manuscript is the private property of an author until publication with all the attributes of ownership within the concept of personal property.[27] This right of authorship is lost—no doubt often inadvertently—when the owner puts his work in the public domain by publication without obtaining a copyright. The right of authorship becomes a copyright with similar individual privileges for the owner by publication and the affixation of the copyright notice.[28]

The only United States statutory definition concerning publication is not directly applicable. It is § 26 and applies to § 24 as to duration of copyright. It does give some indication of congres-

Justice Story on circuit in Gray v. Russell, C.C.D.Mass.1839, 10 Fed.Cas. pp. 1035, 1039, No. 5,728, 1 Story 11, 20–21.

26. The word "forfeit" is adopted to avoid "dedication" or "abandonment" which seem to suggest purposeful release to the public. The purpose of a statutory "publication" is immaterial. National Comics

Publications v. Fawcett Publications, 2 Cir., 1951, 191 F.2d 594, 598; Nimmer, Copyright Publication, 56 Col.L.Rev. 185 note 4 (1956).

27. Ferris v. Frohman, 223 U.S. 424, 434, 32 S.Ct. 263, 56 L.Ed. 492; 17 U.S.C. § 2, note 9, supra.

28. 17 U.S.C. § 10.

sional thinking on the subject. It reads as follows:

"In the interpretation and construction of this title 'the date of publication' shall in the case of a work of which copies are reproduced for sale or distribution be held to be the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed by the proprietor of the copyright or under his authority, * * *."

"Public distribution" is the phrase of importance in this case. In England there is a statutory definition in the 1956 Copyright Act, § 49(2) (c):

"subject to the preceding paragraphs, a literary, dramatic or musical work, or an edition of such a work, or an artistic work, shall be taken to have been published if, but only if, reproductions of the work or edition have been issued to the public;" Copyright Act, 1956, 4 & 5 Eliz. 2, c. 74.

An authoritative English textbook states the rule as follows:

"Prima facie a literary, dramatic or musical work, or an edition of such a work or an artistic work, is published if, but only if, reproductions of the work have been issued to the public * * *." Copinger and Skone James, Copyright, (9th ed., 1958), p. 21, 30.

In determining whether publication forfeiting the author's power to copyright the addresses has occurred, we must consider the intent of Congress to induce publication for general use by allowing a limited monopoly to enable authors to profit from their writings and the congressional enactment, § 8, which permits a copyright only when the writing have not been put into the public domain, that is, voluntarily released to the public by the author. The Supreme Court has said, apropos of a similar situation: "Such forfeitures are never to be inferred from doubtful language." [29] Nor should they be inferred from doubtful actions. A liberal attitude in protecting any work in its passage from the perpetual but non-productive absolute common law rights of an author to the limited but productive monopoly of the copyright is enjoined upon the courts by the purposes of the Copyright Act. However, an author's intent as to publication should not be given controlling weight against the effect of his acts.[30]

The agreed facts stated at pages 264 and 265 of 284 F.2d, supra, show a wide distribution not only to the press but also to people generally who desired copies through interest in the subjects of the addresses. The handling of the addresses prior to December 1, 1958, when copyrighting was first attempted, indicates a studied effort not only to secure publicity for the contents of the addresses through the channels of information, but to go beyond customary sources of press or broadcasting in distributing the addresses to any interested individual. Publication, for measurement of the duration of a copyright, dates from a sale or when "publicly distributed" by the owner of the copyright.[31] Such a measure for the meaning of publication for release of authorship rights seems most consistent with the Act.

In American Visuals Corp. v. Holland, 2 Cir., 1956, 239 F.2d 740, Judge Frank writing, it was held that a distribution of several hundred copies of an advertising scheme to prospective customers, apparently with suitable notice of copyright claim under § 10 of the Act, was sufficient publication to comply with the statutory requirement of publication for copyright.[32] Even though we follow the

---

29. Washingtonian Pub. Co. v. Pearson, 306 U.S. 30, 42, 59 S.Ct. 397, 403, 83 L. Ed. 470.

30. Cf. Roberts, Publication in the Law of Copyrights, ASCAP Copyright Law Symposium, No. 9, p. 121.

31. 17 U.S.C. § 26, supra, p. 10.

32. "Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; * * *" 17 U.S.C. § 10.

preceding opinion's suggestion that publication to gain a copyright requires less evidence of publication than publication to lose a common law property right, we have been unable to conclude that the distribution of almost all of his addresses by Admiral Rickover was not a dedication to public use. This makes it unnecessary to consider whether the oral presentation alone would or would not be a publication under the Copyright Act.[33]

An important case from this Circuit, Hirshon v. United Artists Corp., 1957, 100 U.S.App.D.C. 217, 243 F.2d 640, discusses publication. Twenty-five hundred copies of a song were distributed in order to publicize it. "All the record shows is that 2,500 copies of appellant's song were printed and that some [2,-000] of them were distributed to broadcasting stations and professional musicians for 'plugging' purposes, chiefly through Broadcast Music Incorporated, named on the copies as a licensing agent. Not a single copy was sold. No license or other permission was given to anyone to perform or otherwise use the song. Nothing was said or done, beyond the described distribution, to give any recipient of a copy the impression that he could make any use of it without first obtaining the proprietor's license through the stated licensing agent." 100 U.S.App.D.C. at 222, 243 F.2d at 645. This was held a limited publication which did not vitiate the copyright.

 The agreed statement of facts in the case under consideration shows no effort to limit distribution of the speeches delivered prior to December 1, 1958, but rather a willingness to make them available to all who might be interested. Certainly when all of Admiral Rickover's acts of distribution are considered together—performance, distribution to the press, the copies sent to individuals at the recipient's request and those sent unsolicited, the copies sent in batches of 50 for distribution by the sponsors of speeches—it is difficult to avoid the conclusion that these acts, in their totality, constitute publication of the speeches and their dedication to the public domain. There is no effort shown to protect the author's private right in any way, no limitation upon who might obtain copies. That these speeches were open to the entire world could not have been more clearly manifested unless the author had printed upon the copies, "All claims to copyright waived." See White v. Kimmell, 9 Cir., 1952, 193 F.2d 744.

Since the distribution was not limited in any way to a particular group, no question exists in this case as to the extent of any limitation so as to avoid "publication" in the copyright sense. Anyone was welcome to a copy.

Nor do we have any problem as to limited use of the addresses by the press for fair comment. The press was free to use the speeches in whole or in part for their news value. But such ephemeral use is far different from the unlimited distribution to anyone who was interested which is manifested by the agreed statement of facts. It is the complete absence of limitation on the use of the printed distributions by anyone at any time which destroyed the common law rights of the author.

### III.

 Copies of the speeches delivered after December 1, 1958, bore this sort of notice: "Copyright 1958, H. G. Rickover. No permission needed for contemporaneous press use. Above copyright notice to be used if most of speech reprinted." Copies of these speeches were deposited in accordance with the act. The appellant does not appear to contend that this notice does not contain all the formal elements required by § 19 of the Code. Rather, it asserts that these notices do not comply with the act be-

33. Cf. Ferris v. Frohman, 223 U.S. 424, 430, 32 S.Ct. 263, 56 L.Ed. 492; Nutt v. National Institute, Inc., 2 Cir., 1929, 31 F.2d 236; Nimmer, Copyright Publication, 56 Col.L.Rev. 185, 194–197 (1956); Kaplan, Publication in Copyright Laws, 103 U.Pa.L.Rev. 469, 473–479 (1955); Selvin, Should Performance Dedicate?, 42 Calif.L.Rev. 40 (1954).

cause, in addition to the required elements, they also contain a conditional permission to use the work. Appellant contends that the terms of this condition are vague, particularly "contemporaneous" and "press", and for this reason the entire copyright is invalid. No authority is cited for these contentions. The argument fails to distinguish between a valid and sufficient notice followed by additional, perhaps questionable, limitations and a notice which fails to comply with the specific requirements of § 19. There is not much merit to appellant's contention that the condition is vague or improper, but in any event the existence of the admittedly valid notice preserves all rights and the contemporaneous granting of limited permission to use the work, whether valid or not, has no effect on the validity of the underlying and fully preserved right.

A question is raised as to fair use of these later addresses in compilations or in quotation or criticism. This is a suit for declaratory judgment, and appellant has not presented a copy of the book or pamphlet it intends to publish. Nor has it otherwise unambiguously indicated just what use it plans to make of these later speeches. Without the planned use before the court, it is, of course, impossible to determine whether it is fair. Appellant's prayer for relief below indicates, however, that it wants to be able to use these speeches "either in full or in part in book form or otherwise." Insofar as that prayer asks for a declaration that the doctrine of fair use will justify publication as a book of verbatim copies of some of these speeches, the matter is put with sufficient definiteness to permit an answer. The publication of a work consisting in substantial part of quotations from another copyrighted work is not permitted under the theory of fair use.[34] If less than the whole text of the speeches is taken, the competitive effect of such a publication by the appellant on the similar work published in compliance with the Admiral's copyright would be a relevant factor.[35] The question as to the fair use of the addresses copyrighted after December 1, 1958, is left to the District Court on remand.

The record shows that there are some of the addresses to which our holding may not be applicable. Copies of No. 23, Education—Our First Line of Defense, bore a copyright notice that is sufficient to protect it from use by others under § 10 of the Act. Nos. 7, Nuclear Power—Challenge to Industry, and 12, Christopher Columbus, are said not to have been distributed to the public as the others were.

In these circumstances, we conclude it is better to reverse and remand to the District Court for further hearing and application of this opinion.

It is so ordered.

WASHINGTON, Circuit Judge (dissenting).

I would affirm the judgment of the District Court. I do not believe that the dissemination of the 22 speeches delivered prior to December 1, 1958, was such as would defeat the author's common law right of first publication. They were therefore not in the public domain when Admiral Rickover filed his application for registration of the speeches in compiled form under Section 12 of the Copyright Act, 17 U.S.C. § 12 (1958). Consequently, nothing in Section 8 of the Act would bar the validity of the copyright thus secured, both as to the compilation and as to the individual speeches contained in it.

It is clear that Admiral Rickover intended to foster the widest public dissemination of his words—as current news—for the sake of advancing his own views and programs. But I think that it is equally clear that he meant to preserve, and actually did preserve, the exclusive

34. See Folsom v. Marsh, C.D.Mass.1841, 9 Fed.Cas. p. 342, No. 4,901; Toksvig v. Bruce Pub. Co., 7 Cir., 1950, 181 F.2d

664; Yankwich, What is Fair Use?, 22 U.Chi.L.Rev. 203 (1954).

35. See 56 Col.L.Rev. 585, 593, 597 (1956).

right to publish the speeches in compiled form after their immediate news value had passed away. Speeches of men in the forefront of public life are unique among literary products. Not only are they often works of considerable literary merit, but they may also be "news" of the first importance. As "news" they deserve the widest unfettered contemporaneous dissemination. Where, as here, an author seeks to advance this end by making copies of his speeches available to the press and other interested persons, he is serving the public's interest as well as his own. But insofar as they have a commercial value as literary works after their immediate news importance has passed, they belong appropriately to their creator. The public interest in the news value of the author's work may cut across or postpone his rights; but that is not to say that it extinguishes them.[1]

In my judgment the rule which requires a publication to be "limited" to avoid forfeiture of property rights in the material published is wholly inapposite here.[2] There can be no limited publication of "news"; "news" as such is everyone's property. Compare Chicago Record-Herald Co. v. Tribune Association, 7 Cir., 1921, 275 F. 797, 798. But what remains, after the news value of

the words has passed, should belong exclusively to the author, or his assignees. The people who will buy a compilation of Admiral Rickover's speeches, months and even years after they have been reported in the press, will do so because they prize the fruits of the author's intellectual and literary efforts. There is nothing in the law which would compel this court to deprive the creator of the right to reap financial benefits from these efforts because, at the time of their creation, they had the added virtue of being newsworthy events of immediate public concern. Nor is there anything in the law which compels us to attach such a consequence to acts taken by an author to communicate to members of the public that element in his works which is properly theirs. It is a very grave matter for a court to pronounce the forfeiture of an author's intellectual property. I cannot conclude that such a result is warranted here.

The plaintiff-appellant comes to the courts without having contributed one iota to the work it seeks to appropriate. It has not even gathered and compiled the speeches—on the contrary, it seeks to force Admiral Rickover to collect and present to it copies of all of them. This is a litigation which in its every aspect deserves to fail.

---

1. Cf. Atlantic Monthly Co. v. Post Publishing Co., D.C.D.Mass.1928, 27 F.2d 556, dealing with a copyrighted magazine article which was also "political 'news' of the most important character," id. at page 557. Such a copyright, in my view, should be no bar to bona fide contemporaneous quotation by the press, whether or not express permission to copy is given.

2. This test is characteristically invoked where there has been a prepublication circulation of a literary or musical work for promotional purposes, e. g., Hirshon v. United Artists Corp., 1957, 100 U.S. App.D.C. 217, 243 F.2d 640; Ilyin v. Avon Publications, Inc., D.C.S.D.N.Y. 1956, 144 F.Supp. 368. It is sometimes said that dissemination must be limited to some ascertained group or class, White v.

Kimmell, 9 Cir., 1952, 193 F.2d 744, but even this requirement has been subject to qualification. See Werckmeister v. American Lithographic Co., 2 Cir., 1904, 134 F. 321, 68 L.R.A. 591. It is evident from these cases, and others treating the same questions, that the notion of "limit" rests upon the assumption that it is within the power of the author to prevent any circulation of his work. When he permits some dissemination, it becomes pertinent to inquire into his motives, to examine the extent of the distribution, and to consider the character of the recipients. Dissemination which is deemed too widespread is punished by forfeiture. Such inquiries, in my view, are quite irrelevant in the case of a leading public official, whose pronouncements on public matters should have—and are intended to have—wide dissemination as news.