**PUBLIC AFFAIRS ASSOCIATES, INC.,**
trading as Public Affairs Press,
Plaintiff,

v.

Vice Admiral Hyman G. RICKOVER, U. S. Register of Copyrights, U. S. Librarian of Congress, U. S. Secretary of Defense, U. S. Secretary of Navy, and Glenn T. Seaborg, James T. Ramey, Leland J. Haworth, John C. Palfrey, Robert E. Wilson, as members of the U. S. Atomic Energy Commission,[1] all of Washington D. C., Defendants.

Civ. A. No. 116–59.

United States District Court
District of Columbia.

May 9, 1967.

---

[1] The individual parties are those named in the amended complaint. The Commission members at present are Glenn T. Seaborg, James T. Ramey, Wilfrid E. Johnson, Samuel M. Nabrit, and Gerald F. Tape.

Harry N. Rosenfield, Washington, D. C., for plaintiff.

Royall, Koegel, Rogers & Wells, by William R. Glendon, Washington, D. C., for defendant Rickover.

Irwin Goldbloom, Dept. of Justice, Washington, D. C., for Government defendants.

## OPINION

JOHN LEWIS SMITH, Jr., District Judge.

On remand from the Supreme Court of the United States, plaintiff Public Affairs Associates, Inc., a Washington, D. C. publishing house, seeks a declaratory judgment adjudicating the rights of defendant Admiral Rickover in two speeches delivered by him on December 11, 1958 and May 28, 1959. The first of these entitled "Education—Our First Line of Defense," (hereinafter "the Education speech") was delivered at the Harvard Club in New York City; the second speech, "The Shippingport Atomic Power Station—Lessons From Its Operation," (hereinafter "the Shippingport speech") was delivered to the American Public Power Association Convention in Seattle, Washington.

The original action brought by the plaintiff in 1959 concerned twenty-three speeches delivered by Rickover to various groups between October 20, 1955 and January 16, 1959. Plaintiff was denied permission either to quote from or publish them and received written notice from Rickover's publisher that action would be brought if plaintiff infringed

on Rickover's legal rights. Plaintiff then instituted an action for declaratory judgment contending the speeches resulted from the Admiral's official duties, were partially prepared on Government time with Government facilities, were in the public domain, and therefore that Rickover had no literary property therein. The Admiral contended the speeches formed no part of his official duties and that he had a proprietary interest which could be copyrighted to bar others from disseminating them without permission.

At trial in this court, Judge Holtzoff dismissed the complaint, holding that a Government officer has a literary property right in speeches the delivery of which forms no part of his official duties, although the subject matter has a bearing on them. The court concluded that such literary products are not in the public domain but remain the property of the author to the extent he is protected by copyright and the common law and that his rights are not affected by the fact of Government employment, Public Affairs Associates, Inc. v. Rickover, 177 F.Supp. 601 (D.C.1959).

The United States Court of Appeals for the District of Columbia Circuit reversed and remanded on the issue of public distribution, holding that there was such distribution of the speeches delivered prior to December 1, 1958 as to place the speeches in the public domain prior to obtaining a copyright, thus forfeiting said right. The court remanded the case on the question of fair use of certain of the addresses, particularly those copyrighted after December 1, 1958, Public Affairs Associates, Inc. v. Rickover, 109 U.S.App.D.C. 128, 284 F. 2d 262 (1960).

The Supreme Court of the United States vacated the judgment of the Court of Appeals and remanded the case to this court, Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). Commenting that the "Declaratory Judgment Act was an authorization not a command," the court found the record inadequate to support a ruling and remanded for further proceedings to establish a full and complete record on which an action for declaratory relief might be entertained.

Subsequent to remand, plaintiff filed amended pleadings adding the Shippingport speech (not in issue in the original action) and joining two groups of federal officials as co-defendants. The Register of Copyrights and his superior, the Librarian of Congress, were joined for allegedly violating the Copyright Act, 17 U.S.C. § 8 (1964) in issuing a copyright to Rickover for the speeches. The Secretary of Defense, the Secretary of the Navy, and the members of the Atomic Energy Commission, Admiral Rickover's superiors, were also joined as defendants. The amended complaint asserted denial of plaintiff's constitutional rights under the Freedom of the Press guaranty of the First Amendment to the Constitution by virtue of the Government defendants' refusal to treat the speeches as Government publications within the meaning of the Copyright Act and the Printing Law, 44 U.S.C. § 58 (1964). Rickover has surrendered his claim to all but the Education and Shippingport speeches.

At the time these speeches were delivered, Admiral Rickover held two titles. Under orders issued in 1947 detaching him from primary duty in the then Bureau of Ships and directing him to report to the Secretary of the Navy, he was assigned primary duty in the Atomic Energy Commission reactor program and additional duty with the Bureau of Ships.[2] As Assistant Manager

---

2. A memorandum from the Chief of Naval Personnel to Rickover, dated 14 November 1955, interpreted his orders as follows:

> Your primary duty, as specified by your orders, is with the Secretary of the Navy for duty with the reactor program of the Atomic Energy Commission. In this duty the Secretary should be your reporting senior in so far as fitness reports are concerned, and as a directly attached member of his staff

for Naval Reactors, Division of Reactor Development, Atomic Energy Commission, he was responsible for the Shippingport Atomic Power Station, an experimental water reactor built for research in civilian nuclear power. As Assistant Chief of the Bureau of Ships for Nuclear Propulsion, he had primary responsibility within the United States Navy for the planning, developing, and constructing of nuclear propulsion plants for naval vessels. A portion of Rickover's staff also had dual assignments, and information was freely exchanged between the two positions.

In June, 1958 the Harvard Club of New York City invited Rickover to address its members on the general subject of education and he accepted. The speech, typed by the Admiral's wife at his home, was prepared by him during his evenings over a period of weeks. The final draft, typed by Admiral Rickover's administrative assistant at his office, bore a copyright notice obtained from the Copyright Office after consultation with Mr. A. H. Helvestine of the Navy Department's Office of Patent Counsel. The speech was duplicated on Navy Department facilities, apparently for the dual purpose of security review by the Department of Defense and the Atomic Energy Commission and for distribution as a press release at the Harvard Club. On the day of delivery Rickover traveled to New York on official business the exact nature of which he cannot recall. He delivered the speech on his own time that evening, and the Harvard Club sent an honorarium therefor to a charity specified by him.

On February 6, 1959 the American Public Power Association invited the Admiral to address its Seattle convention on the Shippingport Power Station.

After suggesting education as an alternative topic, Rickover acceded to the association's request and accepted the invitation. The speech was prepared in the same manner as the Education speech with the exception that copies were furnished by the American Public Power Association and the copyright notice differed slightly. The Admiral traveled to the West Coast on official business, the inspection of potential sites for nuclear facilities. The speech was delivered after working hours and without compensation.

The threshold question of the appropriateness of relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (1964), has been raised by all defendants. Defendant Rickover challenges the presence of the basic criterion, a justiciable controversy. Emphasizing the discretionary nature of the doctrine, he asserts that plaintiff's failure to publish the speeches and legislative action pending on the definition of a Government publication warrant the exercise of judicial restraint and denial of the relief sought. These arguments are not persuasive. Rickover has refused plaintiff the right to publish his speeches and through his publisher has threatened suit should plaintiff attempt to do so. There is no obligation on plaintiff to infringe the copyright he challenges, 28 U.S.C. § 2201 (1964), Fed. R.Civ.P. 57, Paramount Pictures Corporation v. Holden, 166 F.Supp. 684 (S. D.Cal.1958), Scott-Burr Stores Corp. v. Wilcox, 194 F.2d 989 (5th Cir. 1952). Judicial restraint is only exercisable when the presence of an actual case or controversy is questioned, Mechling Barge Lines v. United States, 368 U.S. 324, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961), Eccles v. Peoples Bank of Lakewood Vil-

for duty with the Atomic Energy Commission you are free to deal directly with any agency under the purview of the Secretary of the Navy, as your performance of duty may indicate and require.

Your additional duty with the Chief of the Bureau of Ships is related in a way customarily encountered to give administrative convenience, logistic support, and the necessary authority to originate appropriate measures within the Bureau of Ships in support of and consistent with your primary duty.

lage, California, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948), Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). The conflict between Rickover's right to copyright his speeches and plaintiff's right to publish materials allegedly in the public domain has been clearly set forth before this court. Consequently, the court finds that as between these parties a justiciable controversy exists.

■ Declaratory relief need not be considered in connection with the Government defendants since the court lacks jurisdiction. Plaintiff's complaint asks this court to direct nine Government executives to take certain actions in connection with the administration of their respective agencies to protect its own and the public's rights. The court order sought bears on the Register of Copyright's duties under the Copyright Law and internal regulation of employees in connection with that same law by the defense establishment and the AEC. As far back as 1840, it was well settled that no Government officer can be directed in the exercise of his discretionary functions by a court order in the nature of *mandamus*, Decatur v. Paulding, 39 U. S. (14 Pet.) 497, 10 L.Ed. 559 (1840).

■ The promulgation of regulations governing the speech making activities of Defense Department and AEC employees is clearly a duty requiring the exercise of judgment and discretion. It is not ministerial. By the same token registration of a copyright application calls for executive judgment. Neither function is within the power of this court to control, Adams v. Nagle, 303 U. S. 532, 58 S.Ct. 687, 82 L.Ed. 999 (1938). In the words of Chief Justice Taney: "The interference of the courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied,

that such a power was never intended to be given them." Decatur v. Paulding, *supra*, 39 U.S. at 515; see also Perkins v. Lukens Steel Co., *supra*. Accordingly, the complaint as to the Government defendants must be dismissed.

■ The question as originally stated by Judge Holtzoff remains: May a Government employee who prepares and delivers a speech on his own time, on a subject relating to or bearing directly on his employment, claim a proprietary interest in that speech and copyright it as a protection against its unauthorized use? The fundamental determination in resolving that issue is whether the disputed speeches fall within the purview of Admiral Rickover's official duties, United States v. First Trust Company of St. Paul, 251 F.2d 686 (8th Cir. 1958); Sawyer v. Crowell Pub. Co., 142 F.2d 497 (2d Cir. 1944); Sherrill v. Grieves, 57 Wash.Law Rep. 286 (S.Ct.D.C.1929); Heine v. Appleton, 11 Fed.Cas. 1031 (No. 6,234) (C.C.S.D.N.Y.1857).[3] Those duties are a matter of contract between Admiral Rickover and the Navy Department, United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933).

■ Admiral Rickover has asserted that the speeches do not fall within his official duties, and his Government employers have stated categorically that they do not. The narrower assertion that speech making is not enumerated among Admiral Rickover's official duties remains uncontroverted, nor has there been any evidence that he was directed to make the speeches in issue. Normally, such evidence would be dispositive of the question, but the broad authority vested in Rickover as head of the nuclear propulsion program carries with it the power to act in a variety of ways not enumerated in his formal position description. In this context the duties of a high Government official should not

---

**3.** The definition of "official duties" contained in that line of cases ruling on the question of executive immunity from suit is not controlling here, see generally,

Preble v. Johnson, 275 F.2d 275 (10th Cir. 1960) and Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

be narrowly interpreted. Consequently, the circumstances of the preparation and delivery of the speeches and the speeches themselves must be examined to determine whether the Admiral was acting in his public or his private capacity.

Delivery of the speeches had its inception in invitations extended directly to Rickover by two private organizations. There is nothing in the correspondence between these groups and the Admiral to suggest that the invitations were extended to him other than in his private capacity. Rickover treated them as such and did not consult his superiors, the Secretary of the Navy and the members of the AEC. The speeches were prepared in the privacy of Rickover's own home. Purely mechanical operations were then performed on the completed manuscripts by his administrative assistant in typing a final draft for duplication, in the case of the Education speech, on Navy facilities. The duplication served a dual purpose, one official, i. e. obtaining security clearance (Rickover's standard practice no matter what the subject matter of the speech), and the other unofficial, obtaining copies for distribution to the addressees and the press. The additional releases only evidence the Admiral's recognition that his official position made anything he had to say of interest to the press. Furthermore, the copyright notice borne by both speeches appeared in the name of "H. G. Rickover", unqualified by any official titles. Both speeches were delivered on the Admiral's own time. The fact that he was also performing official duties in the area is immaterial; those duties had no connection with the addresses. In short, both speeches were handled as private business from start to finish.

The absence of a disclaimer clause on the speeches as allegedly required by Navy regulations, Navy REG., art. 1252 § 3 (1948), and the alleged use by Admiral Rickover of certain Department of Defense facilities in preparing the speeches are neither material to the case nor proper subjects of comment for this court.

That Rickover delivered the speeches in his private capacity is further confirmed by their subject matter. The Education speech presents the Admiral's private views on the danger of the professional educationist's exclusive control of the public secondary school system. A subject further removed from the Admiral's official duties is difficult to imagine.[4] The Shippingport speech contains the Admiral's views on the meaning of the Shippingport experiment to those private individuals, concerned with future development in public power, who comprised the American Public Power Association. The speech was aimed at administrators, not scientists, and the entire content from a technical standpoint had long been public knowledge. As previously stated, Admiral Rickover sought to address the group on the subject of education. The correspondence makes it clear that the American Public Power Association approached the Admiral as a private individual, and had he insisted, would have agreed to an address on education as the Admiral initially desired. The tone and content of the address ultimately delivered confirm the understanding contained in the correspondence.

---

4. A great deal of evidence was adduced at trial regarding the Admiral's duties in connection with various nuclear training schools in an attempt to show that the Education speech fell within the purview of his official duties. The connection is tenuous in the extreme. Great emphasis was placed on the Admiral's remark in the Education speech that "I have been running schools for years," but it was not pointed out that the remark appears in the context that noneducationists are competent to criticize and shape our public school system. The Admiral further testified that his Navy career has precluded the discharge of his duty to the community as a private citizen and that he has tried to meet this responsibility by devoting a major portion of his private time to studying and speaking on the subject of public education.

In view of the foregoing the court finds that the writing and delivery of the speeches formed no part of Admiral Rickover's official duties and that the speeches are the Admiral's private property which he was entitled to copyright.

The factual and legal determinations considered, *supra*, make it unnecessary for the court to discuss administrative practice in the Defense Department, the Atomic Energy Commission, or the office of the U. S. Register of Copyrights in connection with the two speeches in issue.

By the same token the finding that Admiral Rickover was entitled to copyright the speeches precludes the necessity of discussing plaintiff's allegation of infringement of his rights under the Freedom of the Press guaranty of the First Amendment to the Constitution.

 Plaintiff's complaint would appear to invoke the doctrine of fair use [5] which has been defined as the privilege of using copyrighted material in a reasonable manner without the copyright owner's consent. Toksvig v. Bruce Pub. Co., 181 F.2d 664 (7th Cir. 1950). The doctrine is usually applied in the case of scientific, legal, and historical materials, Eisenschiml v. Fawcett Publications, Inc., 246 F.2d 598 (7th Cir. 1957), *cert. denied*, 355 U.S. 907, 78 S.Ct. 334, 2 L. Ed.2d 262 (1957) and also arises in connection with compilations, listings, and digests, Benny v. Loew's, Incorporated, 239 F.2d 532 (9th Cir. 1956). Furthermore, the doctrine permits copying of themes or ideas but not their expression, Bradbury v. Columbia Broadcasting System, Inc., 287 F.2d 478 (9th Cir. 1961), *petition for cert. dismissed*, 368 U.S. 801, 82 S.Ct. 19, 7 L.Ed.2d 15 (1961), Sheldon v. Metro-Goldwyn Pictures Corporation, 81 F.2d 49 (2d Cir. 1936). The applicability of the doctrine here is doubtful. Ultimately, however, what is fair use depends on the particular circumstances of the use, Toksvig v. Bruce Pub. Co., *supra*, 181 F.2d at 666. Since there has been no clear showing of the use to which the quotations would be put, the court finds the doctrine inapplicable.

Findings of Fact and Conclusions of Law are annexed hereto.

Accordingly, it is this 9th day of May, 1967, ordered that the plaintiff's complaint be, and it hereby is, dismissed.

Counsel will present an order in accordance with this opinion.

## FINDINGS OF FACT

1. Plaintiff is an educational publisher located in Washington, D. C., specializing in pamphlets and books on national affairs. Its list of publications includes works of the U. S. Government which are in the public domain.

2. The defendants are (1) Hyman G. Rickover (hereinafter "Rickover"), a Vice Admiral in the United States Navy and an official of the Atomic Energy Commission; (2) the Secretary of Defense; (3) the Secretary of the Navy; (4) the Commissioners of the Atomic Energy Commission; (5) the Register of Copyrights; and (6) the Librarian of Congress, the superior of the Register.

3. Plaintiff seeks a declaratory judgment that Rickover cannot retain copyrights on the written texts of two speeches delivered by him in 1958 and 1959 and an order directing him to cancel these copyrights. It further seeks an order requiring the Register of Copyrights and the Librarian of Congress to expunge these copyrights from the records of the Copyright Office and directing the other defendants to instruct Rickover that he cannot copyright these speeches and to issue regulations to this effect. Plaintiff contends that the subject speeches are "publications of the United States Government" and hence

---

5. Plaintiff's complaint states in part:
 * * * in view of defendant Rickover's denial of plaintiff's right to quote from said speeches or press releases * * *. and said defendant's threat of restraint to prevent plaintiff's use thereof, an actual controversy exists between the plaintiff and said defendant.

barred from copyright by 17 U.S.C. § 8 (1964).

4. All defendants assert that the speeches were not made as a part of Rickover's duties and accordingly are not publications of the United States Government and that the copyrights thereon are valid.

5. The two speeches in issue are "Education—Our First Line of Defense" (hereinafter "the Education speech") delivered on December 11, 1958, before the Harvard Club at 27 West 44th Street in New York City and "The Shippingport Atomic Power Station; Lessons From Its Operation" (hereinafter "the Shippingport speech") delivered on May 28, 1959, before the American Public Power Association at the Olympic Hotel in Seattle, Washington.

6. The Education speech concerns the general education of American children and consists primarily of criticism of professional educators. The Shippingport speech concerns the general problems involved in constructing the Shippingport Atomic Power Station, a joint project of the Atomic Energy Commission and the Duquesne Light Company designed to produce civilian atomic power.

7. On October 29, 1958, Morris B. Schnapper (hereinafter "Schnapper"), plaintiff's president and principal stockholder, wrote Rickover and asked him for copies of two of his speeches (not here in issue). Schnapper wanted to quote from these speeches in a book to be published entitled *Seapower in the Nuclear Age* by Anthony Sokol. On October 31, Rickover's office forwarded copies of the speeches but informed Schnapper that he could not quote from them because they were to be in a book of Rickover's speeches which would be published ·in the near future.

8. Plaintiff, on the theory that the speeches were in the public domain, announced plans in the November 10th issue of the New York Times to publish a volume of Rickover's speeches entitled *What Rickover Thinks*.

9. Rickover, never having been consulted about this book and not approving of it, protested to Schnapper and informed him he did not wish it to be published. Schnapper indicated his intent to proceed over Rickover's objection. By letter dated November 10, 1958, plaintiff was advised by E. P. Dutton & Co., Inc. that Rickover had signed a contract with it for publication of his speeches, and that if plaintiff published his proposed volume, Dutton would sue on Rickover's behalf.

10. On December 1, 1958, Rickover filed an application for registration of a claim to copyright on the Education speech which was given registration number A 363451. On May 26, 1959, Rickover filed a similar application on the Shippingport speech which was given registration number A 393449.

11. On January 16, 1959 plaintiff instituted suit against Rickover as sole defendant for a declaratory judgment as to twenty-three speeches, the last of which was the Education speech.

12. In October, 1959, Judge Holtzoff of this court, on the basis of an agreed statement of facts, dismissed the complaint, holding that the twenty-three speeches delivered by Rickover were not made as a part of his official duties and accordingly were not Government publications, Public Affairs Associates, Inc. v. Rickover, 177 F.Supp. 601 (D.C.1959).

On appeal, the United States Court of Appeals for the District of Columbia Circuit held [109 U.S.App.D.C. 128, 284 F. 2d 262 (1960)] that none of the speeches were Government publications, but reversed and remanded to the District Court to determine the extent to which the first twenty-two speeches might have been dedicated to the public domain by publication without notice of copyright' and the extent to which "fair use" could be made by plaintiff of the speeches which had not been so dedicated.

The Supreme Court granted *certiorari* and on March 5, 1962 (369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604), vacated the judgment of the Court of Appeals and

remanded the case to the District Court for disposition not inconsistent with its opinion. The court pointed out that the Declaratory Judgment Act is an authorization not a command and stated among other things, "So fragile a record is an unsatisfactory basis on which to entertain this action for declaratory relief."

13. After remand by the Supreme Court, plaintiff amended the complaint to include the Shippingport speech and to add as defendants, in their official capacity, the Government officials specified in Finding No. 2., *supra*.

14. On January 11, 1963, Rickover abandoned his claim to copyright on the first twenty-two speeches. Only the Education and Shippingport speeches are in issue before this court.

15. Both speeches were written by Rickover himself at his home during his leisure time. No one assisted him in research work for the two speeches. Both speeches required substantial effort and considerable drafting and revision on Rickover's part, about a month for the Education speech and approximately two weeks for the Shippingport speech.

16. Both speeches were typed in final form with notice of copyright thereon by Rickover's administrative assistant from drafts he turned over to her. The Education speech was duplicated on Bureau of Ships facilities, and the Shippingport speech was duplicated by the American Public Power Association. The mimeographed copies of both speeches with notice of copyright thereon were distributed prior to delivery.

16. Rickover's copyrights were duly registered after consideration by the Copyright Office. The copyright notice appeared on the deposit copies submitted with the application form as follows:

Education speech:

Copyright 1958, H. G. Rickover

No permission needed for contemporaneous press use.

Above copyright notice to be used if most of speech reprinted.

Shippingport speech:

Copyright 1959, H. G. Rickover

No permission needed for newspaper or news periodical use.

Above copyright notice to be used if most of speech reprinted.

17. With respect to the Education speech, Rickover was asked by the Harvard Club to speak on the subject of education and he did so. Beginning in 1954, Rickover had developed an interest in the general subject of education. Having no hobbies or outside ·activities, Rickover commenced studying and speaking on education as an avocation. He receives and reads a large quantity of educational literature and has delivered a number of speeches on the subject.

18. With respect to the Shippingport speech, Rickover initially indicated to his host, the American Public Power Association, that he would like to speak on the subject of education. However, when representatives of the Association made clear their preference that he speak about Shippingport, Rickover acceded to their wishes.

The invitation to Rickover to speak to the Association originated with Alex Radin, its General Manager. Radin extended the invitation to Rickover through Senator Henry M. Jackson whom he knew to be a personal friend of Rickover. Both Radin and Senator Jackson understood that Rickover could accept or decline the invitation to speak. Senator Jackson telephoned Rickover and asked him to accept the invitation as a personal favor to him.

19. Rickover traveled to New York and to the Seattle area on official business unrelated to the speeches. On both occasions his travel expenses were paid by the Atomic Energy Commission. The American Public Power Association had offered to pay his travel expenses to Seattle, but Rickover declined the offer because he had official business in the Seattle area unconnected with the speech.

20. While Admiral Rickover does not recall the exact nature of his official business in New York, it is his practice

to conduct business at airports, hotel rooms, and similar places at all times of the day and night. On the occasion of the Education speech, Rickover arrived in New York in mid-afternoon, and he had available some three hours before the speech and four hours after the speech for official business.

With respect to the West Coast trip, Rickover's official business involved inspection of the Bremerton Navy Yard, the Keyport torpedo station and Bangor Island. The day after the speech Rickover conferred with the director of the University of Washington laboratory which was conducting research for the Navy and with the Commandant of the 13th Naval District.

21. Rickover was not on official duty while delivering these speeches. Taking time off without formal application for leave is permitted for officers of Rickover's rank.

22. Both speeches were given at private affairs before private audiences.

The Education speech was given to a group of Harvard Club members who were interested in Rickover's views on the educational needs of the United States and what he felt a private university could do to meet those needs.

The Shippingport speech was given to a group of American Public Power Association convention members who were interested in Rickover as a national figure and as an authority in the nuclear reactor field.

23. Each speech was released to the press prior to its delivery. Rickover himself issued the Education speech press release, while the Shippingport speech was released by the American Public Power Association. These releases were authorized by Admiral Rickover in his capacity as a private individual.

24. The Shippingport speech was a non-technical address to a non-technical audience. The speech was subjective in nature and was not consistent with Atomic Energy Commission policy in that the Commission was encouraging public utilities to get into the atomic power field at the time whereas the speech warned them against entering this field too quickly because of the high costs.

All information concerning Shippingport was unclassified. Prior to the speech there had been full dissemination of the technical information derived from Shippingport by the Technical Information Division of the Atomic Energy Commission. Rickover had no duty in this respect, and the speech itself is now substantially outdated.

25. Rickover received no compensation for either speech. With respect to the Education speech Rickover informed the Harvard Club that should any emolument be involved he would like it contributed to charity, and the Harvard Club did so.

26. The writing and delivery of the Education speech and the Shippingport speech were not part of Rickover's duties with the Navy or the Atomic Energy Commission. The speeches were not made in furtherance of his duties. His duties did not call for the writing and delivery of these speeches, nor was he requested to deliver them by his superiors.

27. At all times material to this case, Rickover held two U. S. Government posts simultaneously; Assistant Director for Naval Reactors, Division of Reactor Development, Atomic Energy Commission, and Assistant Chief of the Bureau of Ships for Nuclear Propulsion, United States Navy. His duties in both agencies were inseparable, and part of his staff served both interchangeably irrespective of their payroll designation. Rickover's duties were substantially the same for the period from 1956 to the date of the trial: those duties are highly technical.

28. In 1958 and 1959 Rickover's duties in the Atomic Energy Commission and the Navy consisted generally of responsibility for the development and installation of nuclear reactors for naval ship propulsion. As an additional duty

he was responsible in the Atomic Energy Commission for the development of the Shippingport reactor.

29. More specifically, Rickover's duties included responsibility for research, design, development, construction, and the improvement of naval nuclear reactors and associated equipment; for operations of naval prototype plants and the Shippingport reactor; for installation, maintenance, and disposition of nuclear systems and components used in Navy nuclear propulsion plants; for the construction and maintenance of associated Atomic Energy Commission facilities; for all aspects of reactor plant safety; and for providing technical assistance in the training and qualification of personnel connected with the nuclear reactor program.

30. While Rickover was granted discretion in his reactor development work in that he was assigned a developmental project with the object of achieving an end result, his authority had well defined limitations in both the AEC and the Navy. He was subordinate to other officials in both agencies, and his authority was circumscribed not only by the regulations which delineated his duties but also by numerous other regulations, orders, and directives which conferred specific authority on other employees or branches of the AEC and the Navy. For example, while Rickover furnished the AEC with technical reports of the developmental work being done at Shippingport, he had no authority or duty to disseminate this information outside the AEC. This was the function of the Technical Information Division of the AEC. That Division had nothing to do with the preparation and delivery of the Shippingport speech.

31. The Naval Reactors Branch planned and directed the technical and administrative aspects of the development of reactors for naval ship propulsion. As a special assignment, it planned and directed the technical and administrative aspects of the pressurized water reactor for civilian power at Shippingport, Pennsylvania. The Branch was also responsible for liaison with the Navy Department in carrying out approved Naval Reactor Programs.

32. Considerable evidence was introduced by plaintiff with respect to the training of nuclear personnel. This evidence is irrelevant to the issues in this case. Rickover was concerned, as are most naval officers, with the training of competent personnel. This concern arose from his responsibility for the safety of nuclear reactors and his need to be certain that the designers and operators thereof were competent and qualified in their highly technical duties. To this end, certain members of Rickover's staff would review the technical content of the training program at the nuclear training sites and inspect these facilities periodically. They noted any deficiencies in the training and submitted recommendations for the improvement thereof to those in charge. Rickover had no responsibility for the operation of these training facilities, nor was he concerned with the mode and manner of instruction there. Rickover had no connection with any of the remedial courses provided at one of the training facilities other than an awareness that they had been found necessary. Rickover's concern about the technical competency of nuclear personnel did not create any duty to write and deliver the Education speech.

33. Rickover's specific function, as Assistant Director for Naval Reactors in the AEC, of "review and concurrence in all proposed classification decisions and public information releases concerning Naval Reactor Programs" did not impose any duty on him to deliver the Shippingport speech, nor did that function bring the speech within his official duties.

34. Throughout the course of this matter Rickover's employer, the Government, has consistently taken the position that it was not part of Rickover's duties to write and deliver the subject speeches. Accordingly, the Government has continually maintained that it has no right or interest in these speeches, that they

are not publications of the United States, and that they are copyrightable.

35. The Department of the Navy determined in December, 1958, after an investigation resulting from a complaint by Schnapper, that Rickover obtained his copyright on the Education speech as a private citizen, not in connection with his official duties.

36. The then Chief of the Examining Division of the Copyright Office, who is now the Register of Copyrights, in December, 1958, reviewed Rickover's copyright application on the Education speech. After examining the speech, he determined that its copyrightability was clear on its face and approved the copyright registration.

37. In response to a further complaint by Schnapper, the chief patent and copyright attorney of the Department of the Navy determined in February, 1959, that the Education speech was not written or delivered as part of Rickover's official duties.

38. The chief patent and copyright attorney of the Department of the Navy determined in May, 1959, that the Shippingport speech was not written or delivered as part of Rickover's duties. This determination was communicated to and accepted by the Office of General Counsel of the Atomic Energy Commission in May, 1959.

39. The then Chief of the Examining Division of the Copyright Office, who is now the Register of Copyrights, after reading the Shippingport speech and inquiring as to Rickover's duties, approved the registration of the copyright on that speech.

40. In 1963, in answer to plaintiff's interrogatories, both the Department of the Navy and the Atomic Energy Commission, Rickover's employers, formally stated their determination that these two speeches were not written or delivered as part of Rickover's official duties.

41. The Government agencies involved, which have to deal on a continuing basis with the issue of what constitutes a "publication of the United States Government" for the purpose of 17 U.S.C. § 8, have uniformly taken the position that if a publication was not prepared by a Government employee as a part of his official duties it is not a publication of the United States Government, irrespective of its subject matter.

42. It is the policy and practice of the Copyright Office in determining whether a work by a Government employee is a publication of the United States Government to consider whether the work is written as a part of the employee's official duties. If the work was not so written, it is held copyrightable and is registered irrespective of its subject matter.

43. The defendants, the Department of Defense, the Department of the Navy and the Atomic Energy Commission, have consistently recognized the right of Government employees to write privately concerning their duties or otherwise and to copyright such works if they were not written as a part of their official duties.

44. It is the policy of the Executive Branch of the Government, as stated by the Executive Office of the President, that if works are prepared by employees of the Government in their private capacity (i. e., not as part of their official duties), they are not publications of the United States Government.

45. The court notes that the Comptroller General of the United States has recognized and approved the established practice of Government scientists and experts writing for publication on subjects pertaining to the particular work on which they are employed and that such writings are not official publications if they have not been prepared at the direction of the official superiors of the author or as part of his official duties.

46. There were introduced into evidence the regulations of the defendant Executive agencies in effect in 1958 and 1959 governing private writings by employees. These regulations do not relate to the matter of copyright and do not affect the right of an employee to copy-

right his writings. They are merely agency standards governing the conduct of employees in their private writings and statements, and any departure therefrom is a matter of agency discipline.

47. The Government has found it desirable to encourage its employees to write privately, including private writings concerning the subject matter of their official duties, since (a) publishing is important to the professional standing of many employees; (b) many employees are persons of great talent and knowledge and their works contribute to the fund of public knowledge and thereby benefit society; and (c) the policy assists in securing highly qualified personnel.

## CONCLUSIONS OF LAW

1. The court lacks jurisdiction to grant plaintiff the relief sought against the Government defendants in the nature of *mandamus* compelling them to adopt and enforce regulations or in any way to discipline their employees, since these are discretionary matters.

2. As between Admiral Rickover and plaintiff, this is a proper case for the exercise of the court's discretionary jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1964), since a justiciable controversy is presented.

3. The issue in this case is whether the two speeches involved in this action are "publications of the United States Government" within the meaning of the Copyright Act, 17 U.S.C. § 8 (1964), prohibiting copyright thereon.

4. The legal test to be applied in determining this issue is whether the two speeches were written and delivered as a part of Admiral Rickover's official duties.

5. Since the two speeches were not written or delivered as a part of Admiral Rickover's official duties, they are not "publications of the United States Government" within the meaning of the Copyright Act, and the copyrights on the two speeches are valid.

6. The copyrighting of these two speeches does not deprive plaintiff of its rights of freedom of speech and freedom of the press within the guaranties of the First Amendment to the Constitution.

7. The doctrine of fair use is not applicable in this case.

8. Pursuant to 17 U.S.C. § 116 (1964), costs will be assessed against the plaintiff, but all parties shall pay their own attorney's fees.